Susan M. FAHERTY, Administratrix of the Estate of Michael R. Faherty, Deceased, and Susan M. Faherty, in Her Own Right

v.

Vincente GRACIAS, M.D., Trustee of the University of Pennsylvania, Michael B. Shapiro, M.D., William S. Hoff, M.D., Michael Rotondo, M.D., Rajesh Ghandi, M.D., Scott Kelly, M.D., Heidi Frankel, M.D., Donald Kauder, M.D., Rajan Gupta, M.D. and Paul Dabrowski, M.D., Appellees.

Appeal of: Susan M. Faherty.

Superior Court of Pennsylvania.

Argued February 16, 2005.
Filed May 12, 2005.

Daniel J. Hetznecker, Philadelphia, for appellant.

Charles A. Fitzpatrick III, Philadelphia, for appellees.

Before: GANTMAN, PANELLA, and OLSZEWSKI, JJ.

OLSZEWSKI, J.:

¶1 In this medical malpractice case, plaintiffs sued Dr. Vicente Gracias and the trauma nurses of the Hospital of the University of Pennsylvania. According to plaintiffs, a retained laparotomy sponge caused Michael Faherty to suffer a bacterial infection which then led to Mr. Faherty's sepsis, multiple organ failure, and subsequently, his death. A jury, however, found that neither the nurses nor Dr. Gracias was negligent. Mr. Faherty's wife has now appealed and raises (in all) twenty-two claims of error. We do not believe that any of appellant's claims have merit and must affirm.

¶2 On April 7, 1999, Michael Faherty was involved in a horrific automobile accident; a car smashed into the driver's side of his automobile. The impact caused extraordinary damage to Mr. Faherty's body and required him to be rushed to Brandywine Hospital. When he arrived at Brandywine, he was in a critical state. According to the doctors, he was in clinical shock; was suffering from massive internal bleeding and was hypotensive;[1] was hypothermic, with a body temperature of 93 degrees; was tachycardic;[2] had respiratory insufficiency and had to be placed on a ventilator; and was acidotic.[3] Further, Mr. Faherty had multiple facial fractures, an open-book fracture of the pelvis from which he was bleeding; he also was bleeding from his retroperitoneum,[4] mesentery,[5] spleen and intestines, and he "had his bowel torn out. He had his mesentery disrupted, he had his colon resected and he had a massive liver injury." N.T. Trial, 1/23/04, at 41.

¶3 The fact that Mr. Faherty's bowel was ruptured is important to this case; this rupture caused fecal matter to spill into his abdomen. Moreover, and complicating these terrible injuries, was Mr. Faherty's pre-existing hepatitis C infection. Not only did his hepatitis cause him to enter with a damaged liver (and, thus, with a lessened ability to detoxify his body), but the medications he took to treat his hepatitis acted as suppressors of his immune system.

¶4 The trauma team at Brandywine was forced to run "damage control" in order to resuscitate Mr. Faherty. The surgeon performed an "exploratory laparotomy,"[6] removing Mr. Faherty's spleen as well as irrigating and draining the stool and liver contaminations that seeped into Mr. Faherty's abdomen. The surgeon then "removed I think something like 107 centimeters of bowel, the terminal ileum, as well as the right colon .... He re-anastomosed the bowel. He put packs in to control the

1. Meaning that, as a result of his bleeding, his blood pressure had dropped to very low levels.

2. His heart rate was very high.

3. As appellant's expert, Dr. David Befeler, explained: "[a]cidotic means that the metabolism of the body depends on oxygen. The body is able to metabolize oxygen. And when that is a problem, it builds up acid in the blood, particularly when there is muscle injury, builds up lactic acid; and we can measure that." N.T. Trial, 1/21/04, at 81.

4. This is "the part of the abdomen, the back of the abdomen." Id. at 32.

5. The mesentery is the fold of tissue that attaches an organ, here the small bowel, to the abdominal wall.

6. An exploratory laparotomy is where a doctor "looks through the abdomen and makes a diagnosis with one's eyes, one's hands and deals with what you find inside the abdomen. It literally means an exploration inside the abdomen and fixing what needs to be fixed." N.T. Trial, 1/21/04, at 8.

oozing that was present, more likely than not from a coagulopathy, and he closed the skin." Videotaped Deposition of Dr. Saul Weinstein, taken 1/19/04, at 45 (entered into evidence and shown to the jury on 1/22/04). While the skin was closed, Mr. Faherty's abdomen was not fully closed. As Dr. David Befeler explained, the reason why the abdomen was not fully closed was that "until all the bleeding is brought under control, you can't close the abdomen." N.T. Trial, 1/21/04, at 32–33.

¶ 5 The "packs" Dr. Weinstein references above are laparotomy pads [7] ("lap pads" or "lap sponges") and they were packed into Mr. Faherty's abdomen in order to control his internal bleeding. Yet, since this was in the very early stages of damage control and since the only priority was saving Mr. Faherty's life, neither the Brandywine nurses nor the surgeon counted the number of lap sponges that were packed into Mr. Faherty's body.

¶ 6 The Brandywine team did all it could with its resources. Mr. Faherty had already taken 20 pints of blood (the body holds roughly 10 pints) and had depleted Brandywine's supply; yet, Mr. Faherty continued to bleed internally. This required that Mr. Faherty be transferred to a Level I trauma center, or a "center[ ] that specialize[s] in trauma and [has] physicians on call around the clock and OR teams prepared around the clock to deal with emergencies of all types." N.T. Trial, 1/21/04, at 25. Mr. Faherty was thus transferred, on April 8, 1999, to the Level I trauma center at the Hospital of the University of Pennsylvania ("HUP").

¶ 7 When Mr. Faherty arrived at HUP, he was still bleeding internally. The doctors first stabilized him and, "in addition to providing blood, in addition to providing fluids, in addition to providing antibiotics, [ ] they took him back to the Operating Room on the 8th of April and removed the lap pads or removed some of the pads that were present, if not all of the pads that were present from Brandywine and placed additional pads in the patient to control the bleeding." *Id.* at 40–41. According to the nurses' report, 14 lap sponges were packed into Mr. Faherty's abdomen during the April 8, 1999 surgery. A handwritten operative note, written by a medical student and cosigned by a fellow, however, states that 15 lap pads were left inside Mr. Faherty. N.T. Trial, 1/21/04, at 221–22.

¶ 8 During the next two days, Mr. Faherty's "blood pressure came up, his blood loss abated so that he wasn't bleeding out. He woke up . . . . He basically improved." *Id.* at 45. This enabled the surgeons at HUP to schedule Mr. Faherty for another surgery and, on April 10, 1999, Mr. Faherty was taken to the operating room. This surgery was performed by Dr. Vicente Gracias; the purpose of this surgery, however, was contested at trial. According to Dr. David Befeler, the April 10th surgery was:

> a completion of the trauma surgery in the sense that this operation, the one of the 10th, was for the purpose of removing the packing, sewing up the patient, giving him a gastrostomy tube so that he could be fed—that's a hole in the stomach so that he could be fed—and preparing him, because he had stabilized, preparing him so he could get better and eventually leave the hospital. So that it's no longer fully trauma sur-

---

7. Laparotomy pads are about the size of a kitchen towel and are "cheese cloth . . . in the corner of this cheese cloth . . . there is a radio—what we call a radiopaque marker. This marker shows up on X-ray, and it's there for a reason. It's there because if you want to see if there is a lap pad somewhere, that's why this has a marker, so you can see it on the X-ray." N.T. Trial, 1/21/04, at 34–35.

gery. You're not doing damage control. You're not starting the patient off with stabilizing him. This is a stable patient who you are now sewing up and getting ready for the rest of his life.

N.T. Trial, 1/21/04, at 26–27.

¶ 9 Dr. Gracias disputed the above statement in every sense of the word. As Dr. Gracias declared, the April 10th surgery was indeed damage control and Mr. Faherty was still "in critical condition . . . . He has ongoing coagulopathy. He's on a ventilator. He's required two packings and he's still bleeding." N.T. Trial, 1/22/04, at 112. The whole purpose of the April 10th surgery, according to Dr. Gracias, was just to "close his abdomen." The reason for this, as Dr. Gracias testified, was because:

Mr. Faherty is undergoing damage control. His physiology is not correcting. We have him on paralyzing medication to keep him from moving. All of those things have inherent risks, myopathy, especially Pancuronium, which is one of the few drugs we had back then. It's steroid-based and described in the literature. It increases the risk of myopathy, muscle weakness. We try to get them off as quickly as possible.

We can't stop the paralytic unless we close the abdomen because he'll cough, and the next thing you know his stomach is ripped away or his anastomosis, the place we operated to hook him back up, gets torn, anything can happen.

The second reason, probably the most important one . . . is what we call intraatomospheric fistula, holes in the stomach or whatever intestine you have left, your colon, whatever small bowel Mr. Faherty may have had. If we leave these patients open for an extended period of time, we know that they will develop holes in their intestines and in their stomach because God did not intend for your insides to live on the outside.

So no matter what, we will try to close his abdomen . . . . In damage control, [closing the abdomen] doesn't mean anything other than the fact that we were able to get him to survive long enough to a point where we can attempt closure to protect his intestines so that we can stop the paralyzing medication. It doesn't mean he's better.

. . . . .

Closing the abdomen just means maybe, maybe we dodged one bullet, the intraatomospheric fistula, and maybe we can stop the paralytics. That's all it means.

N.T. Trial, 1/22/04, at 116–18.

¶ 10 So, on April 10, 1999, Dr. Gracias operated on Mr. Faherty. As Dr. Gracias testified, he "removed all the sponges from his abdomen, as much as I could. I looked everywhere because I wanted to make room in his abdomen for his liver, his stomach, whatever intestine was left, his colon so that I could close his abdomen." Id. at 123. In all, Dr. Gracias removed 14 lap sponges from Mr. Faherty. According to Dr. Gracias, the nurses assured him that 14 sponges were placed in Mr. Faherty during the April 8, 1999 surgery. Dr. Gracias also performed a tracheostomy and placed a gastrostomy tube ("G Tube") in order to feed his patient. And, after all of this, Dr. Gracias closed Mr. Faherty's abdomen.

¶ 11 For the next few days, "Mr. Faherty rallied" and his condition stabilized somewhat. He, however, then began to run a fever. Initially, the doctors believed Mr. Faherty had pneumonia and they placed him on appropriate antibiotics. While this treatment caused Mr. Faherty's pneumonia to subside, it did nothing to alleviate his elevated temperature and, on April 16, 1999, Dr. Donald Kauder did a CAT scan on Mr. Faherty. The results of this scan "demonstrated a retained sponge

in the right upper abdomen lateral to the liver, with an associated air fluid collection behind this, most likely representing an infected collection." Videotaped Deposition of Dr. Saul Weinstein, taken 1/19/04, at 50 (entered into evidence and shown to the jury on 1/22/04).

¶ 12 The following day, Mr. Faherty's abdomen was again opened and Dr. Kauder found the retained sponge in an area behind the liver. Surrounding the lap pad was "a moderate amount of purulent fluid, or pus," so Dr. Kauder not only removed the sponge, but also drained and swabbed the surrounding fluid. Cultures on the fluid found

> predominantly Klebsiella ..., also Staphylococcus and also Bacteroides. Those were the three organisms that were—particularly Klebsiella and Bacteroides that are found in the bowel. They were also organisms found in the blood cultures performed on Mr. Faherty around that period of time. So we know he had not only sepsis, but a septicemia, which means there was bacteria in his bloodstream at that point in time and they were in the lap pad. And the one that is the most worrisome is the Bacteroides.

N.T. Trial, 1/21/04, at 59.

¶ 13 Two or three days later, Mr. Faherty began to "show signs of active inflammatory processes." N.T. Trial, 1/22/04, at 136. According to Dr. Weinstein, Mr. Faherty "developed pancreatitis and went on to develop an ongoing septic picture."

Videotaped Deposition of Dr. Saul Weinstein, taken 1/19/04, at 50 (entered into evidence and shown to the jury on 1/22/04). Then, on the 24th of April, Mr. Faherty's G Tube came loose and leaked "enormous amount[s] of fluid in[to] the left upper quadrant of Mr. Faherty's abdomen." N.T. Trial, 1/22/04, at 139. That same day, Dr. Gracias again performed surgery upon Mr. Faherty, so as to reattach the G Tube, drain and wash out the spillage. As Dr. Gracias explained, this G Tube had come off because Mr. Faherty was requiring an inordinate amount of fluid, which was then shifting in his abdominal walls and also because his "body had made no healing protein whatsoever ... [he] wasn't healing anything ... there was no fibrinous, no scar tissue, nothing" to hold the tube in place. *Id.* at 148.

¶ 14 This final surgery could not stem Mr. Faherty's septic course and "on or about the 7th of May, ... the family changed the patient's code status to DNR, which is do not resuscitate." Videotaped Deposition of Dr. Saul Weinstein, taken 1/19/04, at 51–52 (entered into evidence and shown to the jury on 1/22/04). Mr. Faherty died of multiple organ failure [8] and sepsis [9] on May 7, 1999.

¶ 15 Believing that all of the doctors and nurses who cared for her husband were negligent, Susan M. Faherty instituted the present lawsuit and charged them all with wrongful death. Dr. Gracias and the nurses of HUP, however, were the only defendants to make it to trial and a jury found them all not negligent. Ms. Faherty has

---

8. "Multiple organ failure" is "when basically more than two organs are failing, and it's one of the manifestations of sepsis and various other total-body trauma." N.T. Trial, 1/21/04, at 121.

9. Sepsis is "basically the manifestation of an overwhelming infection." N.T. Trial, 1/21/04, at 121. It "occurs when you get bacteria into a nonsterile area in the body, but most of the body is sterile with the exception of the bowel and the various cavities and the skin. The internal part of your body should be sterile. When that's invaded by some organism, then you get infection. If the body's immune system is not successful in eliminating or localizing that infection, then you can become septic." *Id.* at 120–21.

now appealed, arguing that the trial court erred in: 1) refusing to grant a judgment notwithstanding the verdict (n.o.v.) on the issue of the nursing staff's negligence; 2) denying the motion for a directed verdict regarding the nursing staff's negligence; 3) denying the directed verdict motion with respect to the negligence of Dr. Gracias; 4) failing to instruct the jury on *res ipsa loquitur*; and 5) various, miscellaneous other rulings.

¶ 16 To begin with, however, we must address the complete disrespect appellant shows our Rules of Appellate Procedure. Appellant's "Statement of Questions Involved" section goes on for five pages, with one "question" on each page and an argument section beneath. As Rule of Appellate Procedure 2116 mandates,

> [t]he statement of the questions involved must state the question or questions in the *briefest and most general terms,* without names, dates, amounts or particulars of any kind. *It should not ordinarily exceed 15 lines, must never exceed one page,* and must always be on a separate page, *without any other matter appearing thereon.* This rule is to be *considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby.* Whenever possible each question must be followed immediately by an answer *stating simply whether it was affirmed, negatived, qualified or not answered by the court or government unit below.*

Pa.R.App.P. 2116(a) (emphasis added).

██ ¶ 17 Appellant's brief violates this rule, as well as many others, in untold ways. The most flagrant abuse of this rule, and the one we will not today tolerate, is in regards to appellant's final "question." Appellant asks:

> Whether the trial court abused its discretion on a number of evidentiary issues, the net effect of which was to prejudice plaintiff's presentation of its case, including denial of a pivotal theory, and made other evidentiary rulings which demonstrated that the court had injected its own opinion of the case and had in fact adopted defendant's theory regarding key causation issues.

Appellant's Brief, at 7.

¶ 18 Appellant references "a number of evidentiary issues;" however, any particular claim of error *must* be "set forth in the statement of questions involved or suggested thereby." Pa.R.App.P. 2116(a). As the rule explicitly declares and our case law binds, this rule is "in the highest degree mandatory, admitting of no exception." *Id.* Yet, appellant's argument does not even suggest how the trial court erred. This substantially impedes our ability to effectively review appellant's claims and, as we held in *King v. Stefenelli,* we here hold that the "sub-issues" appellant completely fails to state under argument number five are all waived. 862 A.2d 666, 669 n. 2 (Pa.Super.2004).

██ ¶ 19 Appellant's first and second arguments are better viewed together. According to appellant, the trial court erred when it first refused to direct a verdict as to appellee nurses' negligence and, second, when it failed to grant a judgment n.o.v. against the nurses for their negligence. Both errors, appellant asserts, mandate a new trial to be awarded. Our standard of review, however, does not allow this Court to grant appellant relief.

██ ¶ 20 When reviewing an appeal from the denial of a request for judgment n.o.v., the appellate court must "view the evidence in the light most favorable to the verdict winner and give him or her the

benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences." *The Birth Ctr. v. The St. Paul Companies, Inc.,* 567 Pa. 386, 397, 787 A.2d 376, 383 (2001). Thus, the grant of a judgment n.o.v. "should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner." *Atkins v. Urban Redevelopment Authority of Pittsburgh,* 489 Pa. 344, 414 A.2d 100 (1980). It is only when either "the movant is entitled to judgment as a matter of law" or "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant" that an appellate court may vacate a jury's finding. *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992).

¶ 21 Our standard of review with respect to the denial of a directed verdict is the same: we may only ask whether the trial court's decision was an abuse of discretion or an error of law that controlled the outcome of the case. *Lear, Inc. v. Eddy,* 749 A.2d 971, 973 (Pa.Super.2000). The trial judge, however, may only grant a directed verdict motion where "the facts are clear and there is no room for doubt." *Id.* In so determining, the trial court "must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony." *Id.*

¶ 22 According to appellant, the facts of this case, along with testimony of expert witnesses, irrefutably proved that the nursing staff was negligent during both the April 8 and April 10, 1999 surgeries. Appellant's expert, Dr. Jane Claire Rothrock, R.N., first opined that the nursing staff was negligent during the April 8, 1999 surgery when it failed to follow the correct "sponge count" procedures. This

is not, however, completely true and a jury could have found that the nurses followed the standard operating policies in their entirety.

¶ 23 Dr. Rothrock first explained that sometimes,

> when we begin the surgical procedure, we have a priority; and the most important thing is saving the patient's life. We may not count [the lap sponges]. We may not even have sterile things on. We just throw gloves on and we go to work.

> When things quiet down, then we try to get organized and try to account for things. And in that time everyone makes their very best effort to make sure we have accounted for what we have used or we know we've been unable to account for that, and then we have a mechanism in place for that, also.

N.T. Trial, 1/21/04, at 215.

¶ 24 With respect to the sponge count, at the time of the April 8th surgery, HUP also had "a very specific policy for what you do if you leave sponges in a patient's abdomen if you pack them." *Id.* at 225. As Dr. Rothrock stated, this policy dictated that "if you know the number of sponges that you have put in there with certainty, then you are supposed to write that on the record, X number of sponges packed into the abdomen. If you are unsure of the number, then you are to mark it as an incorrect sponge count." In this case, the April 8, 1999 nursing operative report declared that 14 sponges were left inside Mr. Faherty's abdomen. Yet, directly next to the number 14 is a notation that reads "incorrect." Nurses Perioperative Note, 4/8/99. Thus, since the nurses of the April 8th surgery did "mark it as an incorrect sponge count," a jury could have found that the nurses followed Dr. Rothrock's stated procedures.

¶ 25 Appellant, however, goes on to argue that even if the nurses were not negligent on the 8th, they assuredly were on the 10th when, according to Dr. Gracias, they told him that 14 (and only 14) sponges were to be taken out of Mr. Faherty's abdomen. Appellant, however, forgets that appellees' expert, Dr. David Livingston, testified that he found the nurses' standard of care to be "met, that the care was very good throughout his hospitalization." N.T. Trial, 1/23/04, at 165. Further, appellant's position is dependent upon appellant's own view as to the "purpose" of the April 10, 1999 surgery. As was stated above, appellant's experts all looked upon the April 10 surgery as "Phase III" of damage control, or in other words, the final, formal closure of the abdominal wall. *See, e.g.,* N.T. Trial, 1/21/04, at 26–27; N.T. Trial, 1/22/04, at 56. Looking at everything from this point of view, most of appellant's experts testified that the nurses were negligent to allow for the possibility of a retained sponge.

¶ 26 Dr. Gracias, however, expressly stated that the April 10th surgery was not the definitive abdominal closure. N.T. Trial, 1/22/04, at 185–86. As Dr. Gracias testified, the reason why Mr. Faherty's abdomen was closed on the 10th was merely to help correct his physiology and to prevent against intraatomospheric fistula. N.T. Trial, 1/22/04, at 116–17. The sponges, according to Dr. Gracias, were removed only "to make room in his abdomen for his liver, his stomach, whatever intestine was left, his colon so that I could close his abdomen." *Id.* at 123. In such cases, "[y]ou *try* to slip out all the sponges, you *try* to get everything out and wash it out and you leave that liver alone and you close the abdomen." N.T. Trial, 1/23/04, at 40 (emphasis added); see also, *id.* at 166 (stating: "they were able to take him back to the Operating Room and *try* to get the lap pads out. This is what they attempted to do.")

¶ 27 Thus, this testimony told the jury that removing all the sponges on April 10th was neither mandatory nor high priority. Added to all of this was the expert testimony of Dr. Roger Nieman. Dr. Nieman's testimony implied that, during the April 10th surgery, it was not imperative for all lap sponges to be removed. As he testified: "[t]he laparotomy sponge is sterile. It comes out of a sterile package. It's put into the abdomen sterilely. There is no bacteria there." N.T. Trial, 1/23/04, at 136–37. Because of its sterile nature, Dr. Nieman opined that the treatment of Mr. Faherty's bacterial infection would have been the same regardless of the retained sponge. *Id.* at 148–49.

¶ 28 In other words, the jury was left to believe that appellant's experts were holding the nurses and Dr. Gracias to an unwarranted standard of care given the situation; appellant's experts all assumed that the April 10th abdomen closure was Phase III of damage control. These experts then opined that, since this was the definitive closure, all of the sponges must be extracted from Mr. Faherty's abdomen. Dr. Gracias' testimony contradicted this view; he stated that this was not Phase III of damage control and was not the final closure of Mr. Faherty's abdomen. He allowed the jury to believe that neither he nor the nurses were in a position where they had to take absolutely every precaution to avoid the retention of a lap sponge.

¶ 29 Under the circumstances as explained by Dr. Gracias, a jury could have found that the nurses had no obligation to correctly ascertain the particular number of sponges that were inside of Mr. Faherty on April 10; it was just not that imperative given the purpose of the surgery. This was a surgery that, according to Dr. Gracias, was merely intended to help Mr. Fah-

erty's physiology and prevent the onset of intraatomospheric fistula. N.T. Trial, 1/22/04, at 116–17. And, as Dr. William Schwab explained, one only *tries* to extract all of the sponges in such circumstances. N.T. Trial, 1/23/04, at 40.

¶ 30 This view is further bolstered by appellees' expert, Dr. Roger Nieman. As Dr. Nieman testified, the April 10, 1999 surgery was not the final closure of Mr. Faherty's abdomen. Rather, since Mr. Faherty's bowels spilled into his abdomen, his abdomen would "definitely" have had to been drained, regardless of whether the sponge was in there or not. *Id.* at 139. Further, Dr. David Livingston opined that the leaked bowel content, in "combination [with his] colon injury and ... splenectomy and his shock" made the "likelihood of intraabdominal infection" approach 100 percent. *Id.* at 175–76. All of this gives credence to Dr. Gracias' view of the April 10th surgery and the implication that the surgery was not a permanent closure of the abdomen.

¶ 31 The above paragraph, however, is superfluous given our standard of review. The testimony of Dr. Gracias regarding the purpose of the April 10th surgery, plus the testimony showing that a retained lap sponge is simply not that high of a priority given the circumstances, allowed the jury to find that the nurses did not breach their standard of care as to Mr. Faherty. This was a situation where ascertaining the correct number of sponges was not imperative; and, because a jury could rightfully find the nursing staff not negligent, neither a directed verdict nor a judgment n.o.v. would have been proper in this case. *Moure*, 529 Pa. 394, 604 A.2d 1003, 1007 (1992).

¶ 32 For these same reasons, it is also a meritless assertion that "the court below committed an error of law in denying a request for a directed verdict as to the negligence of defendant Vicente Gracias, M.D." Appellant's Brief, at 23. Yet, since we view the evidence in the light most favorable to Dr. Gracias, there is another reason why a directed verdict would have been improper against Dr. Gracias. As Dr. Livingston testified, since the nurses' notes indicated that there were 14 lap sponges left in, Dr. Gracias would only have tried to take 14 lap sponges out. According to Dr. Livingston, "[s]o the thing says 14. The count is 14 out. The nurses said 14. And he reaches around. He's not going to lift up the whole liver again or, if he could, to immobilize it, to look behind it for a lap pad that he doesn't think is going to be there anyway, and he closes." N.T. Trial, 1/23/04, at 167. This is especially true, Dr. Livingston declared, given the "very damaged" state of Mr. Faherty's liver at the time. *Id.* at 170.

¶ 33 Appellant also argues that the trial court "erred in failing to give an instruction on res ipsa loquitur" as against Dr. Gracias. The issue is, however, waived.

¶ 34 The trial court has explained the underlying facts regarding appellant's proposed *res ipsa loquitur* instruction. As the trial judge stated:

Here, Plaintiff contends that during the charging conference a request was made for a jury instruction on the doctrine of *res ipsa loquitur*. This trial judge responded, *"I have to look at this one. I have to just re-read it, so I'll let you know Monday morning."* However, on the following Monday morning, this trial judge did not revisit this issue nor did Plaintiff remind this trial judge either before, during, or after the charge that the requested jury instruction on *res ipsa loquitur* was not given ... Plaintiff neither made an exception, nor brought the issue of the *res ipsa loquitur* charge

to the court's attention prior to the jury's release to deliberate.

Trial Court Opinion, 10/7/04, at 16–17 (emphasis in original).

¶ 35 The trial judge thus made no ruling on appellant's *res ipsa* instruction and appellant not only failed to bring the instruction to the court's attention but also failed to object during the jury charge. Under these circumstances, appellant's claim is waived. As our Supreme Court declared in *Dilliplaine v. Lehigh Valley Trust Co.*,

> Requiring a timely specific objection to be taken in the trial court *will ensure that the trial judge has a chance to correct alleged trial errors*. This opportunity to correct alleged errors at trial advances the orderly and efficient use of our judicial resources. First, appellate courts will not be required to expend time and energy reviewing points on which no trial ruling has been made. Second, the trial court may promptly correct the asserted error. With the issue properly presented, the trial court is more likely to reach a satisfactory result, thus obviating the need for appellate review on this issue. Or if a new trial is necessary, it may be granted by the trial court without subjecting both the litigants and the courts to the expense and delay inherent in appellate review. Third, appellate courts will be free to more expeditiously dispose of the issues properly preserved for appeal. Finally, the exception requirement will remove the advantage formerly enjoyed by the unprepared trial lawyer who looked to the appellate

court to compensate for his trial omissions.

*Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114, 116–17 (1974).

¶ 36 In this case, the trial judge never ruled on appellant's proposed *res ipsa* instruction. Thus, the trial court never had the chance to correct its alleged error, leading to all of *Dilliplaine's* concerns to come into play.

¶ 37 Appellant, however, argues that the mere submission of a jury charge preserves the issue for review. It is true that if the court rules against a particular jury charge, that party need not "take exception" to the ruling. Pa.R.Civ.P. 227(a). And, as all of the cases cited by appellant hold, a trial judge's *ruling* against a proposed charge will indeed preserve the issue for review. *See, e.g. Brancato v. Kroger Co.*, 312 Pa.Super. 448, 458 A.2d 1377, 1380 (1983) (where trial judge *denied* a number of appellant's points for charge, all were preserved regardless of whether appellant "took exception"); *Jones v. Montefiore Hosp.*, 494 Pa. 410, 431 A.2d 920, 923 n. 5 (1981) (*stating*, "[a]lthough no specific objection was made at trial to the charge given, appellants' *exception to the trial court's refusal to charge as requested on causation* was sufficient to put that charge before us for appellate review"). Yet, a *ruling* must be made: *Dilliplaine*, as well as Pennsylvania Rule of Civil Procedure 227,[10] make this clear.

¶ 38 Therefore, since the trial judge was never allowed to rule on appellant's proposed charge, the issue is waived.

---

10. Titled "Exceptions," Pennsylvania Rule of Civil Procedure 227(a) states:

> It shall not be necessary on the trial of any action or proceeding to take exception to any ruling of the trial judge. An exception in favor of the party *against whom the adverse ruling was made* shall be deemed

> to have been taken with the same force and effect as if it had been requested, noted by the official stenographer and thereafter written out, signed and sealed by the trial judge.

Pa.R.Civ.P. 227(a) (emphasis added).

¶ 39 Finding all of appellant's claims either waived or meritless, we thus affirm the trial judge's judgment.

¶ 40 JUDGMENT AFFIRMED.

¶ 41 Concurring Statement by GANTMAN, J.

GANTMAN, J., concurring.

¶ 1 I concur in the result. I write separately to state I do not think a *res ipsa loquitor* jury instruction was warranted in this case.