Kirk RETTGER and Erik Rettger, Co–Executors of the Estate of Michael Rettger, Deceased

v.

UPMC SHADYSIDE; Eugene Bonaroti; and Oakland Neurosurgical Associates.

Appeal of UPMC Shadyside.

Kirk Rettger and Erik Rettger, Co–Executors of the Estate of Michael Rettger, Deceased

v.

UPMC Shadyside; Eugene Bonaroti; and Oakland Neurosurgical Associates.

Appeal of UPMC Shadyside.

Superior Court of Pennsylvania.

Argued Dec. 1, 2009.

Filed March 17, 2010.

---

David R. Johnson, Pittsburgh, for appellant.

John W. Jordan, IV, Pittsburgh, for Oakland Neurosurgical, appellee.

Paul A. Lagnese, Pittsburgh, for Rettger, appellees.

BEFORE: MUSMANNO, BENDER and BOWES, JJ.

OPINION BY BENDER, J.:

¶ 1 UPMC Shadyside (UPMC, the Hospital) appeals the judgment entered on the jury's verdict in favor of Kirk Rettger and Erik Rettger, co-executors of the Estate of Michael Rettger, Deceased (the Estate). A jury determined, *inter alia,* that a nurse employed by UPMC had been negligent in her care of the decedent and awarded $2.5 million on a claim of wrongful death but rendered no award on the Estate's survival action. UPMC asserts that the trial court erred in granting a new trial on the Estate's survival action limited to damages and refusing to grant a new trial on all claims. UPMC also asserts, in the alternative, that the court erred in refusing to grant *remittitur.* In addition, UPMC raises multiple challenges to rulings at trial, asserting that the court erred in restricting evidence of the decedent's medical history prior to 1:00 a.m. on November 19,

2003, excluding certain purported admissions of co-defendant Eugene Bonaroti, M.D., refusing to allow the hospital to amend its pleadings during trial to add a cross-claim against Dr. Bonaroti, allowing a physician expert witness to opine on the standard of care for a registered nurse, charging the jury on the duties of a nurse under the Pennsylvania Code, and allowing the jury to take a copy of the disputed Code section into the jury room during deliberation. Upon review, we find no merit in any of UPMC's claims. According, we affirm the judgment of the trial court.

¶ 2 The Estate commenced this action following the death of Michael Rettger at UPMC Shadyside Hospital while under the care of Eugene Bonaroti, M.D., and Oakland Neurological Associates. Mr. Rettger, then twenty-four years old, initially sought treatment at Cabell Huntington Hospital (CHH) in Huntington, West Virginia after suffering sustained, severe headaches while on work assignment in the Huntington area. Diagnostic imaging at CHH revealed a mass in the left side of Rettger's brain, which doctors there diagnosed as glioblastoma multiforme, an aggressive type of brain tumor, with a differential diagnosis of brain abscess. Thereafter, Rettger was transferred to UPMC Shadyside on November 15, 2003, and commenced treatment with Dr. Bonaroti on November 17, 2003. Dr. Bonaroti concurred in the earlier diagnosis of glioblastoma and retained the differential diagnosis of brain abscess. After a consult with a neuro–oncologist, who determined that Rettger's condition was not amenable to his treatment protocol, Dr. Bonaroti scheduled Rettger for a surgical procedure to take place at 7:30 a.m., Wednesday, November 19, 2003.

¶ 3 Pending surgery, Mr. Rettger was placed in a neurosurgical unit at the Hospital and assigned as a patient to nurse Kirsten Stalder. Stalder was a relatively new employee who had completed nurse's training in May 2003 and commenced employment at UPMC Shadyside in June. After hire, Nurse Stalder attended a one-week new nurse orientation and, thereafter, received on-the-job training for twelve weeks. Following completion of her orientation and training experiences, Nurse Stalder provided nursing care unsupervised, subject to the laws of Pennsylvania governing nursing practice, the policies of UPMC Shadyside, and the direction of the attending physician. The policies at issue included the imperative that a nurse invoke the nursing chain of command to obtain proper care for a patient if the attending physician failed to render such care or to call a "Condition C" to obtain immediate critical care for a patient whose condition appeared emergent.

¶ 4 On November 18, the day prior to the scheduled surgery, Rettger displayed uneven pupil size and experienced substantial pain, for which he received narcotic pain medications and an anti-seizure medication. On November 19, shortly after 1 a.m., Nurse Stalder documented on Rettger's chart that the pupil of his left eye was fixed and dilated, indicating escalating pressure on the brain which, if not treated on an emergency basis, could lead to brain herniation and, ultimately, death. Nurse Stalder's notes also indicate that she telephoned Dr. Bonaroti at home to report Rettger's condition. Nurse Stalder's account of the conversation, however, differs sharply from Dr. Bonaroti's. While Stalder asserted that she told Dr. Bonaroti that Rettger's pupil was fixed and dilated, Bonaroti contends that she told him only that Rettger's pupils were uneven, essentially indicating that his condition was unchanged. Dr. Bonaroti did not report to the hospital or order emergency treatment and Nurse Stalder did not invoke the nurs-

ing chain of command or call a Condition C. Thereafter, Rettger's condition continued to deteriorate until, at 6:00 a.m., both pupils were fixed and dilated. When Nurse Stalder telephoned Dr. Bonaroti on that occasion he indicated that he was on his way to the Hospital. Prior to surgery, Rettger lost consciousness and hospital personnel placed him on life support. Although Dr. Bonaroti conducted two emergency surgical procedures that day to relieve the pressure on his brain, Rettger never recovered consciousness and died within twenty four hours. Evaluation during surgery established that Rettger did not suffer from a glioblastoma but rather from a fast growing brain abscess and that as a result of inattention to his worsening condition, he had suffered brain herniation.

¶ 5 The Estate commenced this action within the applicable limitations periods, asserting causes of action for wrongful death and survival and alleging professional negligence by Dr. Bonaroti and hospital staff, among them Nurse Stalder. The Estate also alleged corporate negligence by UPMC in failing to provide adequate training and supervision of its personnel and failing to formulate policies adequate to avoid the breakdown of care that had resulted in Rettger's death.[1] In response, UPMC denied all allegations of negligence but did not join Dr. Bonaroti as an additional defendant pursuant to former Civil Rule 2252(d), and did not seek to file a cross-claim against him pursuant to current Rule 1031.1 until after trial had commenced.[2] After trial commenced, UPMC argued to the jury that all defendants were blameless in Michael Rettger's care and that neither Nurse Stalder nor Dr. Bonar-

oti were negligent. However, after a stipulation by counsel for the Estate that no negligence had occurred prior to the 1 a.m. call by Nurse Stalder to Dr. Bonaroti, additional evidentiary rulings by the trial court focused the jury's inquiry on the two witnesses' competing versions of the call and on the alleged failure of Nurse Stalder to take appropriate action afterward. Thereafter, counsel for the Hospital sought to introduce allegedly inculpatory statements made by Dr. Bonaroti to the decedent's family members as "admissions of a party opponent," in an effort to establish that Dr. Bonaroti, rather than Nurse Stalder, bore primary responsibility for Rettger's death. The trial court, the Honorable Timothy Patrick O'Reilly, refused the tendered evidence, however, on the grounds that Dr. Bonaroti was not a party opponent of UPMC, prompting the Hospital to request, for the first time, that it be allowed to file a cross-claim against Dr. Bonaroti pursuant to Pa.R.C.P. 1031.1. Judge O'Reilly denied the motion as untimely and unduly prejudicial to Dr. Bonaroti, thus eliminating the Hospital's ability to seek contribution from him on any claim for which the defendants were not found jointly liable.

¶ 6 In preparation for the deliberations of the jury, Judge O'Reilly instructed the jurors on, among other things, the legal duty of a hospital and its nurses to monitor the treatment provided by physicians and take appropriate action to protect patients from omissions in physician care. Consistent with that charge, the court read a portion of the Pennsylvania Code prescribing the duties of nurses and allowed the jury to take a copy of the relevant Code

---

1. No party contests that had medical personnel adequately intervened following Rettger's development of a fixed and dilated left pupil, he would not have died but would merely have suffered a vision deficit in his left eye.

2. Rule 1031.1 replaced and superseded Rule 2252(d) by amendment of the Rules of Court effective June 1, 2007. *See* Pa.R.C.P. 1031.1 Explanatory Comment—2007.

section to the jury room. Following deliberations, the jury returned a verdict for the plaintiff but awarded damages only on the wrongful death claims of the decedent's family members. The jury awarded no damages on the Estate's survival claim despite uncontroverted testimony that Michael Rettger was a talented and ambitious young accountant who would have achieved the rank of partner at a national accounting firm or, in private industry, would have become controller or chief financial officer.[3] In view of this apparent discrepancy in the jury's findings, the court granted the Estate's motion for a new trial on the survival claim limited to damages. The court denied UPMC's motion for *remittitur* or a new trial as to all claims and all parties, thus sustaining the jury's award of $2.5 million on the Rettgers' wrongful death claim. Following entry of judgment on the verdict, UPMC filed this appeal, raising the following questions for our consideration:

A. Whether the trial court erred in refusing to grant the Hospital's motion for new trial?

B. Whether the trial court erred in restricting evidence of the decedent's medical history prior to 1:00 a.m. on November 19, 2003?

C. Whether the trial court erred by refusing to permit the opposing party admissions of Dr. Bonaroti and compounded that error by refusing to allow the Hospital to amend its pleadings to assert a cross-claim against Dr. Bonaroti?

D. Whether the trial court erred by permitting a doctor to opine about what a nurse should have known and done[?]

E. Whether the trial court's charge to the jury incorrectly and misleadingly stated the law with respect to the duties of nurses and of a hospital and compounded this error by permitting a portion of the Pennsylvania Code to be taken to the jury room as an exhibit[?]

F. Whether the court erred in failing to grant the Hospital's motion for a remittitur of the excessive wrongful death verdict[?]

G. Whether the trial court erred in granting a new trial on the issue of damages under the [Estate's] survival act claim?

Brief for Appellant at 4.

¶ 7 UPMC's first question, which calls for the award of a new trial on liability, discusses the form of relief requested by the Hospital's second, third, fourth, and fifth questions. Accordingly, our response to UPMC's first question is, in part, also a response to each of those questions as none of the claims for relief they make will be granted unless they establish sufficient basis for the award of a new trial.

¶ 8 Consideration of all new trial claims is grounded firmly in the harmless error doctrine "[which] underlies every decision to grant or deny a new trial. A new

---

3. The Estate established that Rettger's annual salary as a senior accountant at the Big Four firm where he worked was $40,800. The Estate also introduced expert testimony to show that Rettger's total compensation level, had he achieved partnership at that firm, would have totaled $33,521,000 over the remaining forty-one years of his working life. The same testimony indicated that had Rettger achieved the level of senior manager, one step below partner, his compensation would have ranged between $11.6 million and $13 million. The witness also testified that Rettger's total compensation at the level of CFO in private industry would have been between $21 million and $29 million, and as controller, between $13.9 million and $17.8 million. Neither UPMC nor Dr. Bonaroti introduced evidence to refute the Estate's figures.

trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116, 1122 (2000). Once the trial court passes on the moving party's claim, the scope and standard of appellate review coalesce in relation to the reasons the trial court stated for the action it took. *See id.* Where the court is presented with a finite set of reasons supporting or opposing its disposition and the court limits its ruling by reference to those same reasons, our scope of review is similarly limited. *See id.* at 1123. Thus, "[w]here the trial court articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the appellate court must review that reason under the appropriate standard." *Id.* (quoting *Morrison v. Com., Dept. of Pub. Welfare,* 538 Pa. 122, 646 A.2d 565, 571 (1994)).

■■■ ¶ 9 Our standard of review prescribes the degree of scrutiny we apply to the trial court's decision and the manner in which we evaluate its conclusions. *See id.* at 1122 (citing *Morrison,* 646 A.2d at 570). If the trial court's challenged ruling was one of law, we review its grant or denial of a new trial on that point to discern if the court committed legal error. *See id.* at 1123. Similarly, if the challenged ruling involved a discretionary act, we review the disposition of the new trial motion relative to that act for abuse of discretion. *See id.* "Discretion must be exercised on the foundation of reason." *Id.* Accordingly,

[a]n abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice,

bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion.

*Id.* (quoting *Morrison,* 646 A.2d at 570). "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.*

■■■ ¶ 10 Applying the foregoing standard to UPMC's second, third, fourth, and fifth questions, we find no basis for the award of a new trial. In support of its second question, UPMC contends that the trial court erred in refusing to grant a new trial following its limitation on the admission of certain testimony. UPMC argues that "the proffered evidence would have shown the jury how the perceptions of Dr. Bonaroti and Nurse Stalder as to the decedent's condition affected their conduct at 1:00 a.m. on November 19 when Mr. Rettger developed a fixed and dilated pupil." Brief for Appellant at 15. UPMC elaborates that:

The evidence which the Hospital was precluded from introducing would have shown that both the physician responsible for the care of the Rettgers' decedent on November 19, 2003 and all Hospital personnel involved in such care at that time believed that the decedent was suffering from a slow-growing brain tumor rather than from a brain abscess and responded to changes in his condition in the context of that belief. By preventing the Hospital from introducing such evidence, the trial court enabled the Rettgers to present a skewed picture of the course of the decedent's illness and to portray the final hours of a four-day hospitalization as if they had happened in a vacuum, rather than as the culmination of an ongoing misdiagnosis which, through no fault of the Hospital, led to the decedent's demise.

Brief for Appellant at 15. Upon review of the trial court's rulings and the evidence presented to the jury, we find no merit in UPMC's claim. In point of fact, it substantially mischaracterizes the record, presenting a tendentious reading of the evidence divorced from what the jury actually considered.

¶ 11 Our Rules of Evidence vest the trial court with the authority to determine the admissibility of evidence as well as to control the scope of examination. *See Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 585 (Pa.Super.2003). Rule 403 stresses the importance of clear, concise, and expeditious presentation, allowing for the exclusion of evidence that is confusing, cumulative, or unfairly prejudicial:

> **Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time**
>
> Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Pa.R.E. 403. In addition, the Rules vest the trial court with the necessary discretion to limit a party's presentation in an effort to achieve a just result while avoiding duplication or waste of time:

> **Rule 611. Mode and order of interrogation and presentation**
>
> (a) **Control by court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time and (3) protect witnesses from harassment or undue embarrassment.

Pa.R.E. 611. Appellate review of the court's rulings under these rules is limited to determining whether the trial judge abused his discretion. *See Harsh v. Petroll*, 840 A.2d 404, 421 (Pa.Cmwlth.2003). As applied to rulings on the evidence, this standard requires not only technical error but also demonstrated harm; "[e]videntiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment." *Helpin v. Trustees of University of Pennsylvania*, 969 A.2d 601, 617 (Pa.Super.2009).

¶ 12 In support of its claim of error, UPMC highlights three instances in which the trial court limited its examination of witnesses on the subject of the errant diagnosis of brain tumor in an effort to focus the jury's attention around occurrences after 1:00 a.m. on November 19. First, UPMC faults the court's determination not to admit certain deposition testimony by the Hospital's expert, Richard S. Polin, M.D., which elaborated on Michael Rettger's diagnosis and treatment at Cabell Huntington Hospital and later by Dr. Lieberman, the neuro-oncologist who examined Mr. Rettger after his admission to Shadyside Hospital. Brief for Appellant at 19–20. UPMC argues that the court's ruling

> prevented the Hospital from fully explaining to the jury (a) decedent Michael Rettger's medical history; (b) his care and treatment; (c) the failure of multiple physicians to diagnose a brain abscess before 1:00 a.m. on November 19, 2003; and (d) the impact of all these factors in assessing the conduct of Dr. Bonaroti and Nurse Stalder after the decedent's fixed and dilated pupil was detected[.]

*Id.* at 19.

¶ 13 Similarly, UPMC challenges the court's decision to limit Dr. Bonaroti's ex-

amination by Hospital counsel concerning the impact of the prior diagnosis on his own treatment of Michael Rettger. Brief for Appellant at 22. UPMC contends that "[h]ad the jurors heard the excluded background evidence, they might have concluded that the real reason for Dr. Bonaroti's inaction upon receiving Nurse Stalder's 1:05 a.m. phone call ... [was that] the presence of [a fixed and dilated pupil] in a patient who was suffering from a slow-growing tumor (as opposed to a rapidly growing abscess) ... was not a matter of great urgency." *Id.* at 22.

¶ 14 Finally, UPMC faults the court's limitation of questions asked of Nurse Stalder concerning a call she made to Dr. Bonaroti at 8:00 p.m. on November 18, 2003, the evening before the fateful 1:00 a.m. call on which the jury reached its decision. Although UPMC acknowledges the Estate's concession that "nobody is saying there was anything done wrong at 8:00[,]" the Hospital contends that information on the 8:00 p.m. call was necessary for the jury to understand Nurse Stalder's motivation in making the 1 a.m. call as the only change in the decedent's condition at 1:00 a.m. was the fixed and dilated pupil. *Id.* at 23.

¶ 15 We find no merit in any of UPMC's claims as each one assumes that the evidence actually admitted was not sufficient to allow the jury's consideration of the prior diagnosis and the role it played in premising the responses of Dr. Bonaroti and Nurse Stalder when they became aware of the decedent's fixed and dilated pupil. The Estate had conceded that no negligence occurred prior to the 1:00 a.m. phone call. R.R. at 755a–56a. Consequently, the factfinder's need for information on diagnosis and treatment during that period was limited to context. Both the trial court and the Estate recognized as much and agreed with counsel for the Hospital that a certain amount of background information would be admissible but would be circumscribed to prevent emphasis by the defense on the appropriateness of treatment that in fact was never challenged. *Id.* at 753a–55a. Thereafter, the jury was repeatedly apprised of the decedent's symptoms, the prior diagnosis, and the distinct effects of brain tumor and brain abscess on the surrounding brain tissue. Reproduced Record (R.R.) at 01401a, 01489a–01500a, 01642a–1658a, 01717a–1720a, 01724a–01732a, 01841a–01842a. Dr. Bonaroti himself admitted no less that ten times that he thought Michael Rettger suffered from a brain tumor and did not determine that he had a brain abscess until he conducted surgery. *Id.* at 01719a–20a ("Q. Doctor, with regard to the phone call that occurred at 1 a.m., at that time you were under the impression that Michael Rettger had a tumor and not an abscess, weren't you, sir?"). *See also* R.R. at 01489a–91a, 01644a–45a, 01717a, 01726a–27a, 01732a, 01738a, 01743a. Bonaroti testified, in addition that the context in which he had been treating the decedent's case would have prompted him to remember any report of pupil dilation that Nurse Stalder had made during the 1:00 a.m. phone call as the symptom indicated brain herniation and mandated emergency treatment. *Id.* at 1665a–68a. Accordingly, the context of the earlier diagnosis, as well as Dr. Bonaroti's and Nurse Stalder's awareness of it were well known to the jury and oft-repeated; a more detailed explanation of treatment during that period was not appropriate and could only have served to focus the jury's attention on matters not at issue. Accordingly, we dis-

cern no basis for UPMC's assertion that the trial court erred in limiting this evidence.[4]

■ ¶ 16 In support of its third question, UPMC contends that the trial court abused its discretion in refusing to admit allegedly inculpatory statements by Dr. Bonaroti under the "opposing party admissions" exception to the hearsay rule. Brief for Appellant at 24. UPMC argues that in those statements, reported in the deposition testimony of Kirk Rettger, Dr. Bonaroti admitted his responsibility for the decedent's death.[5] Judge O'Reilly precluded the statements' admission on the basis that UPMC had not joined Dr. Bonaroti as an additional defendant pursuant to former Rule 2252(d) or filed a Rule 1031.1 crossclaim against Dr. Bonaroti. The court concluded accordingly, that Dr. Bonaroti and UPMC are not legally opposing parties and the proffered "admissions" remained inadmissible hearsay. On appeal, UPMC rejoins that:

> Practically speaking, this analysis was incorrect. In the final analysis, even in the absence of cross claims, the jury would be deciding whether each defendant were negligent and, if it so found, comparing that defendant's percentage of negligence to that of the other defendant. This alone, made the defendants adverse to each other. Separate and apart from this issue, the factual circumstances of the phone calls and the opposing positions of Nurse Stalder and Dr. Bonaroti clearly demonstrated that they were adverse parties.

Brief for Appellant at 25.

■ ¶ 17 Significantly, UPMC fails to cite a single source of authority, e.g., case law or rule of court, to support its

---

4. For the same reasons, we find no merit in the Hospital's assertion that the trial court erred in limiting Nurse Stalder's testimony concerning the content of her call to Dr. Bonaroti at 8 p.m. the preceding evening. The decedent's treatment during that period was not at issue. Moreover, we find no merit in the Hospital's contention that discussion of the 8 p.m. call was necessary to establish that Nurse Stalder could only have called at 1:00 a.m. to report a change in the decedent's condition. Both Dr. Bonaroti and Nurse Stalder testified specifically about the content of the 1 a.m. call and Dr. Bonaroti testified that Nurse Stalder's observation of the condition of the decedent's left pupil was essentially the same as it had been previously. *Id.* at 1661a. After receiving her report, the doctor asked her to refer back to Rettger's chart and, based on her response, concluded that the sluggish and uneven pupil she reported "sounds like an old finding." *Id.* Accordingly, we conclude that further discussion of the 8:00 p.m. phone call was not necessary.

5. During his deposition, Kirk Rettger testified that following his brother's death, Dr. Bonaroti had made certain inculpatory statements as follows:

> Q. After that, did you have any conversations with Dr. Bonaroti?
> A. I don't believe we had any other conversations that day until the meeting that Erik and Becky and I had.
> Q. What do you recall about that meeting?
> * * *
> A. I remember Dr. Bonaroti being very candid and open in his conversation about the events. I remember Dr. Bonaroti taking full responsibility for what had happened to my brother. I remember discussion about a CT scan that was not viewed in time.
> * * *
> I remember him discussing the fact that he and the doctors associated with Michael's diagnosis misdiagnosed the abscess as a brain tumor and did not evaluate the fact that it was an abscess and ruled that possibility out for no reason other than the fact that they just concurred that it was a brain tumor.
> * * *
> I remember the fact that he made mention of the nurse that had called his house and that he did not act with any measures the evening preceding my brother's operation to do anything and that if he had acted, he would have saved my brother's life. It was about a half an hour long meeting.

Deposition of Kirk Rettger at 23–25 (R.R. at 00619a–00621a).

assertion that it should be permitted to introduce evidence detrimental to a co-defendant when it has never formally asserted a claim against that defendant. We find such a proposition wholly untenable. The applicable rules of court, including former Rule 2252(d) and Rule 1031.1, were formulated for the express purpose of "bringing together into a single law suit causes of action arising out of the transaction or occurrence or series of transactions or occurrences upon which the plaintiff's cause of action is based." *Free v. Lebowitz*, 463 Pa. 387, 344 A.2d 886, 888 (1975). Indeed, "[t]he general plan of joinder procedure is to adjudicate all rights growing out of a certain factual background." *Id.* (quoting 3 Goodrich–Amram, Sec. 2255(d)–9, p. 107). Although rules of procedure do not purport, on their face, to bind a trial court' rulings on admission of evidence, the legal protocols they impose are without purpose if the parties' substantive rights are divorced from them. *Cf. Yacoub v. Lehigh Valley Medical Associates, P.C.*, 805 A.2d 579, 588 (Pa.Super.2002) ("The purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend.").

¶ 18 Thus, UPMC's argument that Dr. Bonaroti's and the Hospital's interests are adverse as a matter of fact is perhaps the single most compelling reason why the appointed joinder procedure must be observed. In its absence, the multiple due process requirements it serves, including notice of claims against which it must defend, are not satisfied; thus, while each defendant is no doubt aware of the factual divergence of its interest from those of other defendants, a duty to anticipate its co-defendant's case is limited. Indeed, to require one defendant to answer another's allegations in the absence of the proper joinder would be to condone trial by ambush. Yet that very practice is precisely what UPMC appears to advocate. Aware as it was of the divergence of Dr. Bonaroti's interest from its own, the Hospital, perhaps for business reasons, made no effort to formalize a cross-claim until rulings at trial compromised its ability to shift responsibility for the decedent's untimely passing. Because UPMC, in failing to follow proper joinder or cross-claim procedure, never gave notice that it considered Dr. Bonaroti to be an opposing party, we find no abuse of discretion in the trial court's determination that hearsay statements attributed to the doctor were not subject to introduction as opposing party admissions.

¶ 19 As a corollary to its assertions on Dr. Bonaroti's purported admissions, UPMC contends that the trial court abused its discretion in refusing to allow it, during trial, to amend its pleadings to assert a Rule 1031.1 cross-claim, thereby enabling introduction of the disputed evidence. UPMC argues that amendment of pleadings is generally favored "in the absence of prejudice to the party being joined," Brief for Appellant at 30, and insists that no cognizable prejudice to Dr. Bonaroti can be shown. *Id.* at 30–31 ("[T]he granting of the Hospital's motion for leave to amend to assert a cross-claim against Dr. Bonaroti would not have necessitated additional discovery by any party or changed Dr. Bonaroti's trial strategy."). We find this claim disingenuous.

¶ 20 We acknowledge, as the Hospital advocates, that "[p]rejudice that would prevent the grant of an amendment must be ... something more than a detriment to the other party 'since any amendment almost certainly will be designed to strengthen the legal position of the amending party and correspondingly to weaken the position of the adverse party[.]' " *Sands v. Forrest*, 290 Pa.Super. 48, 434 A.2d 122, 125 (1981) (citations omitted)

Thus, an allegation of prejudice will be sufficient to deprive another party of the right to amend only if the detriment suffered "would go beyond 'that which would normally flow from the allowance of an amendment.'" *Id.* Such prejudice is most often a function of the lateness with which the proposed amendment is offered:

All amendments have this in common: they are offered *later in time* than the pleading which they seek to amend. If the amendment contains allegations which would have allowed inclusion in the original pleading (the usual case), then the question of prejudice is presented by the *time* at which it is offered rather than the substance of what is offered. The possible prejudice, in other words, must stem from the fact that the new allegations are offered *late* rather than in the original pleading, and not from the fact that the opponent may lose his case on the merits if the pleading is allowed.

*Carringer v. Taylor,* 402 Pa.Super. 197, 586 A.2d 928, 934–935 (1990). In this instance, the prejudice following the last-minute introduction of the inculpatory statements UPMC sought to admit is self-evident. The Hospital did not seek to amend its pleadings until well after the Estate had presented its case and had chosen not to introduce the statements at issue. Thus, the plaintiff, to whom the statements would have posed the most natural advantage, had chosen another trial strategy, *i.e.,* pursuing the inadequate response of Nurse Stalder, thus eliminating Dr. Bonaroti's statements as an avenue of recovery. Accordingly, the doctor rightly concluded that he would not be called to explain the statements and concentrated his trial strategy on responding to Nurse Stalder's version of the 1 a.m. phone call on November 19. The accompanying divergence of trial strategy is starkly obvious. Consequently, we find UPMC's late attempt to file a Rule 1031.1 cross-claim a source of cognizable prejudice that the trial court rightly disallowed. UPMC's claim to the contrary is without merit.

¶ 21 In support of its fourth question, the Hospital contends that the trial court erred in allowing the testimony of the Estate's medical expert, Julian E. Bailes, M.D., concerning the standard of care with which Nurse Stalder should have comported in responding to the change in Michael Rettger's condition when he developed a fixed and dilated pupil.[6] Brief for Appellant at 32. UPMC argues that Dr. Bailes was not qualified to express an opinion concerning nurses, as although he was experienced in training resident physicians, he did not have similar experience in training nurses. *Id.* at 33. In support of

---

**6.** The testimony in question was provided during Dr. Bailes's deposition as follows:

Q. [Plaintiff's Counsel] And, doctor you would agree that this is such a serious issue and such common knowledge that you would expect that a nurse caring for a neurosurgical patient with a brain mass would know that[ ] when a patient develops a fixed and dilated pupil on the same side of [sic] the brain mass, that patient is unstable and needs rapid evaluation and intervention by a doctor, true?
* * *
A. A nurse on a neurological floor should know that, yes.

Q. Okay. And you certainly would expect that any nurse caring for patients on a neurological floor would call the neurosurgeon, ... immediately if this situation developed and tell the neurosurgeon ... in no uncertain terms that the patient has developed a fixed and dilated pupil on the same side as the brain mass, true?
* * *
A. A nurse on a neurological floor should know, yes.

Deposition of Julian E. Bailes, M.D., at 37–38 (R.R. at 1798a–99a).

its claim, UPMC cites this Court's decision in *Yacoub, supra,* arguing that the circumstances in that case are substantially analogous to those here. We find the Hospital's claim without merit.

¶ 22 "The admission of expert testimony is a matter of discretion [for] the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion." *Blicha v. Jacks,* 864 A.2d 1214, 1218 (Pa.Super.2004).

> It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. *Rauch v. Mike–Mayer,* 783 A.2d 815 (Pa.Super.2001). When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. *Miller v. Brass Rail Tavern,* 541 Pa. 474, 664 A.2d 525 (1995). It is to ascertain whether the proposed witness has sufficient skill, knowledge, or experience in the field at issue as to make it appear that the opinion or inference offered will probably aid the trier of fact in the search for truth. *Bergman v. United Servs. Auto. Ass'n,* 742 A.2d 1101 (Pa.Super.1999).
>
> In the field of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. *Bindschusz v. Phillips,* 771 A.2d 803 (Pa.Super.2001). Doctors will have different qualifications and some doctors will be more qualified than others to provide evidence about specific medical practices. *Id.* at 809. *However, it is for the jury to determine the weight to be given to expert testimony in light of the qualifications presented by the witness. Id.*

*George v. Ellis,* 820 A.2d 815, 817 (Pa.Super.2003) (emphasis added).

¶ 23 It is this recognized overlap, in this case between the expertise of a neurosurgeon and that of a neurosurgical nurse, that renders UPMC's argument unsustainable. We recognize, of course, that "if a witness possesses neither experience nor education in the subject matter under investigation, the witness should be found not to qualify as an expert." *Yacoub,* 805 A.2d at 591. Contrary to UPMC's assertion, however, neither Dr. Bailes's expertise nor his experience in working with nurses was in any way deficient; indeed, the record establishes that Bailes spent his entire career practicing in a hospital setting and interacting with nurses daily. Obviously, a neurosurgeon whose orders provide daily direction of the activities of the nurses who care for his patients is familiar with the standard of care expected; if he were not, his ability to depend on their observations and judgment would be sharply limited and his professional practice jeopardized as a result. In this regard, the circumstances here are readily distinguishable from those in *Yacoub,* on which UPMC relies. In *Yacoub,* the doctor, also a neurosurgeon, had not practiced in a hospital setting in years, "could not remember the last time he interacted with nurses working in a Special Care Unit[,]" and had "never published anything regarding nursing." *Id.* at 592. Accordingly, our conclusion in *Yacoub* is readily distinguishable and of little persuasive value here. Given Dr. Bailes's demonstrated qualifications as a neurosurgeon who interacted on an ongoing basis with nurses in a hospital setting, we find no error in the trial court's determination to allow his testimony concerning expectations of a neurosurgical nurse.

¶ 24 In support of its fifth question, UPMC contends that the trial court erred in charging the jury on the law with respect to the duties of a hospital and its

nurses in monitoring the actions of treating physicians. Brief for Appellant at 34. The Hospital argues first that the court's instructions "essentially told the jury that 'nurses should practice medicine' and substitute their judgment for that of doctors," and second that it misstated the bases for a hospital's corporate liability arising out of the misfeasance of a physician. *Id.* at 36. UPMC asserts, in addition, that the court compounded its error by allowing the jury to take with it to deliberations an excerpt of 49 Pa.Code § 21.18, which prescribes the duties of a registered nurse. *Id.* at 38. *See also* 49 PA ADC § 21.18[7]. Again, we do not find these claims a source of reversible error.

■ ¶ 25 Our standard of review of a trial court's charge to the jury is deferential; "[i]n reviewing a trial court's charge ..., an appellate court must not take the challenged words or passage out of context of the whole charge, but must look at the charge in its entirety." *Ettinger v. Triangle–Pacific Corp.*, 799 A.2d 95, 106 (Pa.Super.2002). The court is vested with substantial discretion in fashioning the charge and may select its own language cognizant of the need to adequately apprise the jury of the law as it applies to the evidence adduced at trial. *See id.* Unless the language the court chose incorrectly states the law or mischaracterizes the evidence in a way that prejudiced the jury's consideration and thereby undermined the accuracy of the verdict, we will not interfere with the court's exercise of discretion. *See id.*

¶ 26 In this instance, the trial court charged the jury as follows relative to the duties of Nurse Stalder and UPMC Shadyside:

> Under Pennsylvania law, a registered nurse must act to safeguard the patient from the incompetent practice of any individual.
>
> If the attending physician fails to act after being informed of such abnormalities, it is then incumbent upon the nurse to advise the hospital authorities so that appropriate action might be taken.
>
> When there is a failure of the hospital's nurse to report changes in the patient's condition and/or when there is a failure of the hospital's nurse to question a physician's order which is not in accord with standard medical practice and the patient is injured as a result, the hospital is liable for such negligence.

R.R. at 02143a–44a.

■ ¶ 27 This instruction is in no way flawed and the Hospital's assertion to the contrary is simply wrong. The first paragraph of the instruction, as it appears above, is a direct quote of 49 PA ADC § 21.18(a)(3), which prescribes the duties of a registered nurse. The second two paragraphs, similarly, are quoted directly from our Supreme Court's seminal decision in *Thompson v. Nason Hosp.*, 527 Pa. 330, 591 A.2d 703, 709 (1991), the case in which the Court first imposed corporate liability on hospitals in the context of professional negligence. Accordingly, the charge is correct as a matter of law.[8]

---

7. The excerpt of the Administrative Code that the court released with the jury provided as follows:

   § 21.18. Standards of nursing conduct.
   (a) A registered nurse shall:
   * * *
   (3) Act to safeguard the patient from the incompetent, abusive or illegal practice of any individual.

49 PA ADC § 21.18(a)(3).

8. In view of the fact that the court's charge was correct and the subsection of the Pennsylvania Code released with the jury merely reinforced the charge, we do not find its possession of that subsection during deliberation to be a source of reversible error.

¶ 28 The charge is equally accurate in its reflection of the evidence. Whereas UPMC asserts that the instruction "led the jury to presume that someone had engaged in incompetent conduct which one of the Hospital's nurses should have recognized[,]" Brief for Appellant at 35, the evidence establishes that, in this regard, no "presumption" was required. Indeed, the entire narrative of this case, documented in thousands of pages of transcript, focuses upon the adequacy of Dr. Bonaroti's response to the information he was provided by Nurse Stalder. To the extent the jury should have believed Stalder's recollection of the pivotal 1:00 a.m. phone call and concluded that Dr. Bonaroti was negligent in failing to respond urgently, they would then be compelled to determine whether Nurse Stalder discharged her own duty to protect Michael Rettger from Bonaroti's negligence. Thus, contrary to encouraging any presumption by the jury, the charge equipped its members with the frame of reference necessary to parse the defendants' respective duties in light of the evidence actually introduced.

¶ 29 In support of its sixth question, the Hospital asserts that the trial court erred in denying its motion for *remittitur* of the jury's verdict on the wrongful death action. Brief for Appellant at 40. The Hospital contends that the jury's award of $2.5 million is excessive as Michael Rettger was unmarried and had no children or dependents and provided only limited services in his parents' home, to which he returned on weekends. *Id.* The Hospital fails, however, to cite a single source of authority to support its analysis or even to set forth a standard of review. Accordingly, we find the Hospital's claim waived. *See* Pa.R.A.P. 2119(a), (b); 2101. *See also Creazzo v. Medtronic,* 903 A.2d 24, 28 (Pa.Super.2006).

¶ 30 Even if we were to resolve the Hospital's claim on its merits, however, we would not find sufficient grounds to grant the relief requested. Our standard of review in assessing whether the trial court erred in denying appellant's request for *remittitur* is circumspect.

> Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption.

*Haines v. Raven Arms,* 536 Pa. 452, 455, 640 A.2d 367, 369 (1994) (citation omitted). The decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur. *Doe v. Raezer,* 444 Pa.Super. 334, 664 A.2d 102 (1995); *see also Brinich v. Jencka,* 757 A.2d 388 (Pa.Super.2000). *Potochnick v. Perry,* 861 A.2d 277, 285 (Pa.Super.2004).

¶ 31 "Damages for wrongful death are the value of the decedent's life to the family, as well as expenses caused to the family by reason of the death." *Slaseman v. Myers,* 309 Pa.Super. 537, 455 A.2d 1213, 1218 (1983). Thus, members of the decedent's family enumerated in the Wrongful Death Act, *see* 42 Pa.C.S. § 8301(b), may recover not only for medical, funeral, and estate administration expenses they incur, but also for the value of his services, including society and comfort. *See id. See also Machado v. Kunkel,* 804 A.2d 1238, 1245 (Pa.Super.2002) ("[T]he definition of compensable services for the

purpose of the [wrongful] death statute is similar to the definition of consortium as that term is applied in other negligence cases.").

¶ 32 UPMC's argument seeks to diminish the value of "services" for which the decedent's family members, namely his parents, may be compensated, implying that compensable "services" include little more than the value of household chores. Brief for Appellant at 42 ("His only actual 'services' to his parents consisted of the performance of yard work."). As illustrated by the foregoing discussion, however, the term services as used in this context is not so limited. Rather, the term clearly extends to the profound emotional and psychological loss suffered upon the death of a parent or a child where the evidence establishes the negligence of another as its cause. *See Machado,* 804 A.2d at 1245. In this case, the jury recognized the depth of the anguish suffered by Rettger's parents, awarding them a sum which, while substantial, could not compensate them for the loss of a son they had nurtured to adulthood. The character of their loss is well represented in the testimony of the decedent's mother, Judy Rettger:

> When they finally brought [Michael] up [from surgery], his head was wrapped and bandaged. They had cut him. You could see some of the stitches. They told me that he was heavily sedated and he wouldn't respond.

> And I went into his room. I was rubbing his feet and there was no—there was no response there at all. But I kept telling myself that it was—it was the sedation. He was going to be fine. The [P]olish nuns were praying for him. (Pause noted—witness crying).

> I'm sorry. I don't know what else to say. He was a good guy. He was everybody's friend. He helped everybody. He was there for everyone. I don't

know why this happened to him. And I don't understand why nobody cared about him in that hospital. I just don't understand.

> If somebody is alert and healthy, sitting up in bed, watching TV and eating, and the next day he's all bent up in pain, why didn't somebody say, "There's something wrong here?"

> I just don't understand it. I mean all those policies they talk about, it's common sense if one day you're healthy, the next day your on morphine and—I don't remember what else they told me they gave him, but that didn't work. There's something wrong. There's something wrong. Why didn't they—a doctor come and fix him?

R.R. at 123a–04a. Even viewed within the confines of a cold record, Mrs. Rettger's loss far exceeded the value of her son's yard work. Accordingly, we find no abuse of discretion in the trial court's denial of UPMC's motion for *remittitur.*

■ ¶ 33 Finally, in support of its seventh question, UPMC asserts that the trial court erred in awarding a new trial limited to damages on the Estate's survival action. The Hospital contends that the jury's failure to award any compensation on the Estate's survival claims, which included the value of the decedent's lost wages, is consistent with its prerogative to believe all, part, or none of the evidence. Brief for Appellant at 42–43. The Hospital argues further that the jury had ample reason to disregard the evidence adduced on this point as the testimony the Estate offered on the value of the decedent's lost wages over the course of his career was speculative and excessive. *Id.* at 43. In support, the Hospital cites our Supreme Court's decision in *Carroll v. Avallone,* 595 Pa. 676, 939 A.2d 872 (2007), contending that the evidence presented here was no more controverted than that adduced in

*Carroll* where a zero verdict on a survival claim was upheld. *Id.* Although we find the decision in *Carroll* to be probative, we do not find it controlling on the facts of record here. When correctly considered in light of the controlling legal standard, the record in this case supports the trial court's decision, as the jury's award of zero damages bears no reasonable relationship to the loss actually sustained.

■ ¶ 34 As we noted in our discussion of the Hospital's first question, "the grant of a new trial is a matter within the discretion of the trial court." *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1, 3–4 (1994). "If the verdict bears a reasonable resemblance to the proven damages, it is not the function of the court to substitute its judgment for the jury's." *Id.* at 4. Nevertheless, "[w]here the jury's verdict is so contrary to the evidence as to 'shock one's sense of justice' a new trial should be awarded." *Id.*

■ ¶ 35 "When faced with ... uncontroverted evidence, a jury's verdict must bear a reasonable resemblance to the proven damages." *Id.* at 6. "[This concept], that the verdict must bear a relation to the evidence, is in tension with the notion that a jury may reject any evidence offered, even if uncontroverted; a jury is not obliged to believe or disbelieve any evidence presented at trial, including an expert's opinion." *Carroll,* 939 A.2d at 875. Nonetheless, "a jury's verdict cannot be based on whim or caprice, hence the holding in *Kiser.*" *Carroll,* 939 A.2d at 875.

> Thus, if there is no argument or opposition on a particular point, the jury may not be free to disregard such information. Indeed, to "controvert" means "[t]o raise arguments against; voice opposition to." "Uncontroverted" evidence, therefore, is evidence which is unopposed or unchallenged, not merely uncontradicted. If one party has the burden of proof, opposing counsel may strenuously controvert the evidence through cross-examination and argument; reasons not to accept the plaintiff's evidence may suffice to prevent the meeting of that burden, even without affirmative countervailing evidence.

*Id.* (citations omitted).

■ ¶ 36 In accordance with our Supreme Court's clarification in *Carroll,* we recognize that the mere failure of a defendant to introduce countervailing expert testimony on the subject of damages does not render the plaintiff's evidence uncontroverted. Here, as in *Carroll,* counsel for the Hospital conducted extensive cross-examination of the Estate's expert, in response to which the witness conceded that the assumptions on which he premised his testimony, *i.e.,* that Michael Rettger would achieve highly paid status in the accounting profession, could not be stated with absolute certainty. R.R. at 1309a, 1315a–16a. Thus, "[a] basic factual challenge to the underpinnings of the expert's opinion was made." *Carroll,* 939 A.2d at 875. Nevertheless, the evidence also established that Michael Rettger, unlike the decedent in *Carroll,* had achieved his educational objectives and had embarked on a very successful path in his chosen profession. *Cf. Carroll,* 939 A.2d at 873 (noting that in that case, the estate's expert witness had premised his income estimates on the assumption that the decedent would have become either a nurse's aide or a licensed practical nurse when, in fact, she had not yet been trained in either vocation and was unemployed at the time of her death). Moreover, UPMC *failed to controvert,* through cross-examination or otherwise, that had Michael Rettger been properly treated, he would have survived and been able to continue in the profession for which all the evidence indicated he had shown

extraordinary aptitude. R.R. at 1716a–17a (indicating under cross-examination of Dr. Bonaroti that had the decedent been treated he would have survived and would not have been impeded in continuing as an accountant). Although the evidence indicated that Mr. Rettger would have suffered diminished peripheral vision in his left eye, it also established that such a deficit would not have compromised his professional aptitude. *Id.* Additionally, the record demonstrated as a matter of documented fact that at the time of his death, Michael Rettger was salaried at $40,800 annually, had passed three of the four parts of the certified public accounting exam, and had advanced to a level typically only achieved by those several years his senior.

¶ 37 Given the record before us, we find this case dissimilar from *Carroll* and analogous to *Kiser.* Although counsel in *Kiser* used cross-examination to place multiple assumptions of the plaintiff's expert in question, he failed to undermine evidence that the decedent's estate would have sustained a demonstrable base-line loss stemming from the decedent's lost wages. *See Kiser,* 648 A.2d at 5 (noting that "the uncontroverted testimony at trial was that the net economic loss that would result from Ms. Kiser's death ranged from $232,400.00 to $756,081.43"). As in *Kiser,* UPMC failed to undermine the Estate's documented proof of the decedent's ongoing compensation. Nor did the Hospital challenge the decedent's work life expectancy. This evidence coupled with extensive testimony indicating Mr. Rettger's prospects for advancement in the profession he had already achieved stands in stark contrast with the jury's disposition of the Estate's survival claim. Accordingly, we concur in the trial court's assessment that the jury's award of zero damages bears no reasonable relationship to the loss actually sustained. *See Carroll, su-*

*pra; Kiser, supra.* Thus, the trial court did not err in awarding a new trial on the survival claim limited to damages.

¶ 38 For the foregoing reasons, we affirm the judgment of the trial court.

¶ 39 Judgment **AFFIRMED.**