Kyra HATWOOD and David Jacobs, Individually and as Coadministrators of the Estate of Hyseem Jacobs a/k/a Hyseem Qyrah Jacobs, a Minor, Deceased, Appellee

v.

HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA and Peter Chen, M.D., Appellants.

Superior Court of Pennsylvania.

Argued June 27, 2012.

Filed Oct. 5, 2012.

James Young, Philadelphia, for appellants.

Richard J. Heleniak, Blue Bell, for appellee.

BEFORE: STEVENS, P.J., GANTMAN, J., and PANELLA, J.

OPINION BY PANELLA, J.

Appellants, Hospital of the University of Pennsylvania ("HUP") and Peter Chen, M.D., appeal from the judgment entered on October 18, 2011, by the Honorable Frederica Massiah–Jackson, Court of Common Pleas of Philadelphia County. After careful review, we affirm.

This appeal arises from a medical malpractice action concerning the delivery and

subsequent death of Hyseem Jacobs. Baby Hyseem's mother, Kyra Hatwood, presented at HUP just after midnight on March 22, 2006. After evaluation and monitoring, Baby Hyseem was born *via* caesarean section at 3:42 a.m. He required resuscitation immediately subsequent to birth due to a hypoxic ischemic brain injury. This injury caused cerebral palsy and associated respiratory and neurological conditions. Baby Hyseem died at the age of 17 months from complications associated with cerebral palsy.

Hatwood, David Jacobs, Hyseem's father, and Hyseem's estate filed suit against HUP, Dr. Chen, and Myriam Fernandez, M.D., alleging professional negligence. At the close of plaintiffs' case, the trial court granted a non-suit on plaintiffs' claims against Dr. Fernandez. On February 14, 2011, after a two week trial, a jury awarded plaintiffs an aggregate amount of $2,154,583.00 against HUP and Dr. Chen. HUP and Dr. Chen filed post-trial motions, which were ultimately denied by order dated October 18, 2011. This timely appeal followed.

On appeal, HUP and Dr. Chen raise the following issues for our review:

1. Whether the trial court erred as a matter of law or abused its discretion in charging the jury that it could award damages under the Wrongful Death Act for plaintiffs' loss of the society and companionship of their child?

2. Whether the trial court erred as a matter of law or abused its discretion in denying defendants' motion for judgment n.o.v., and in failing to strike the jury's award for "loss of society and companionship" under the Wrongful Death Act, where plaintiffs failed to offer any evidence to meet their burden of proving the pecuniary loss of decedent's services?

3. Whether the trial court erred as a matter of law or abused its discretion in failing to grant a new trial where the jury's verdict was against the great weight of evidence presented at trial?

4. Whether the trial court erred as a matter of law or abused its discretion in failing to grant judgment n.o.v. or a new trial where plaintiffs offered no evidence upon which the jury could conclude that any allegedly negligent conduct by HUP's nurses or by Dr. Chavkin caused any injury for which recovery was permitted in this matter?

5. Whether the trial court erred as a matter of law or abused its discretion in permitting the jury to consider HUP's liability based on the acts or omissions of the nurses and/or Dr. Chavkin and against Dr. Chen only?

6. Whether the trial court erred as a matter of law or abused its discretion in failing to grant judgment n.o.v. or a new trial where plaintiffs' expert, Dr. Mollick did not express opinions based upon facts established by the evidence, and testified to ultimate fact, as opposed to permissible expert opinion?

7. Whether the trial court abused its discretion by refusing to remit the jury's award of $1.5 million to the plaintiffs for loss of society and companionship of Hyseem Jacobs because that award is shocking and unconscionable based upon the evidence provided to the jury on this issue?

8. Whether the trial court erred as a matter of law or abused its discre-

tion in charging the jury on the increased risk of harm standard?

Appellant's Brief, at 4–5.

■ In their first two issues on appeal, HUP and Dr. Chen argue that the trial court erred in allowing the jury to award damages to Hatwood and Jacobs for the monetary value of Baby Hyseem's companionship, society and comfort had he lived. Specifically, HUP and Dr. Chen first argue that the trial court's instruction to the jury regarding damages recoverable under the Wrongful Death Act was in error.

■ Our standard of review is as follows:

> Under Pennsylvania law, our standard of review when considering the adequacy of jury instructions in a civil case is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue that error in a charge will be found to be a sufficient basis for the award of a new trial.

*Patton v. Worthington Associates, Inc.*, 43 A.3d 479, 490 (Pa.Super.2012) (citation omitted). "Further, a trial judge has wide latitude in his or her choice of language when charging a jury, provided always that the court fully and adequately conveys the applicable law." *Id.* (citation omitted).

■ Pennsylvania's Wrongful Death Act, 42 Pa.Cons.Stat.Ann. § 8301, allows a spouse, children or parents of a deceased to sue another for a wrongful or neglectful act that led to the death of the deceased. This Court has previously explained the damages available under the Wrongful Death Act:

> "Damages for wrongful death are the value of the decedent's life to the family, as well as expenses caused to the family by reason of the death." *Slaseman v. Myers*, 309 Pa.Super. 537, 455 A.2d 1213, 1218 (1983). Thus, members of the decedent's family enumerated in the Wrongful Death Act, *see* 42 Pa.C.S. § 8301(b), may recover not only for medical, funeral, and estate administration expenses they incur, but also for the value of his services, including society and comfort. *See id. See also Machado v. Kunkel*, 804 A.2d 1238, 1245 (Pa.Super.2002) ("[T]he definition of compensable services for the purpose of the [wrongful] death statute is similar to the definition of consortium as that term is applied in other negligence cases.").

*Rettger v. UPMC Shadyside*, 991 A.2d 915, 932–933 (Pa.Super.2010), *appeal denied*, 609 Pa. 698, 15 A.3d 491 (2011). Our Court has unequivocally stated that:

> The purpose of the Wrongful Death Statute, 42 Pa.C.S. § 8301, is to compensate "the decedent's survivors for the pecuniary losses they have sustained as a result of the decedent's death.... This includes the value of the services the victim would have rendered to his family if he had lived."
> ... A wrongful death action does not compensate the decedent; it compensates the survivors for damages which they have sustained as a result of the decedent's death.
>
> Under the wrongful death act the widow or family is entitled, in addition to costs, to compensation for the loss of the contributions decedent would have made for such items as shelter, food, clothing, medical care, education, entertainment, gifts and recreation.

*Machado v. Kunkel*, 804 A.2d 1238, 1245–1246 (Pa.Super.2002), *appeal denied*, 572 Pa. 766, 819 A.2d 547 (2003) (citations

omitted), quoting *Linebaugh v. Lehr*, 351 Pa.Super. 135, 505 A.2d 303, 304–305, (1986).

The trial court instructed the jury on this issue in the following manner:

> In addition to the monetary contributions that the decedent would have contributed to the family support, the plaintiffs are entitled to be [ ] awarded a sum that will fairly and adequately compensate the family for the monetary value of the companionship, society, and comfort that Hyseem Jacobs would have given to his family had he lived; including such elements as work around the home, provision of physical comfort and services, and provision of society and comfort.

N.T., Trial, 2/11/2011, at 195–196.

HUP and Dr. Chen contend that, due to the inherent uncertainty involved in such determinations, no recovery for non-pecuniary losses such as for society and companionship is permissible under the Act. However, the Supreme Court of Pennsylvania has addressed this issue of "uncertainty" by holding that

> [t]he fact that there is no mathematical formula whereby compassionately bestowed benefits can be converted into a precise number of bank notes does not mean that the tortfeasor will be excused from making suitable reimbursement for their loss.... All these things—such as companionship, comfort, society, guidance, solace, and protection which go into the vase of family happiness-are the things for which a wrongdoer must pay when he shatters the vase.

*Spangler v. Helm's New York–Pittsburgh Motor Exp.*, 396 Pa. 482, 484–485, 153 A.2d 490, 492 (1959). Given this precedent, we can discern no error or abuse of discretion in the jury instruction given by the trial court.

Similarly, HUP and Dr. Chen argue that the trial court erred in failing to grant judgment *non obstante veredicto* ("judgment n.o.v.") on the same basis. Our standard of review when reviewing a trial court's denial of a motion for judgment n.o.v. is well settled:

> We must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for [judgment n.o.v.]. A [judgment n.o.v.] should be entered only in a clear case.

*American Future Systems, Inc. v. BBB*, 872 A.2d 1202, 1215 (Pa.Super.2005) (citation omitted). Further, a trial court can only enter judgment n.o.v. upon two bases: "(1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant." *Id.* We will reverse a trial court's denial of judgment n.o.v. only where the trial court abused its discretion or committed an error of law that controlled the outcome of the case. *See Ty–Button Tie, Inc. v. Kincel and Co., Ltd.*, 814 A.2d 685, 690 (Pa.Super.2002).

██ HUP and Dr. Chen assert that Appellees failed to adduce sufficient evidence at trial to support a damage award for loss of society and companionship. However, as Appellees argue, Pennsylvania law has never required proof of such damages to a mathematical certainty. *See Kaczkowski v. Bolubasz*, 491 Pa. 561, 567, 421 A.2d 1027, 1030 (1980); *Smail v. Flock*, 407 Pa. 148, 154–155, 180 A.2d 59, 61–62 (1962); *Spangler, supra; Bragdon v. Pittsburgh Rys. Co.*, 375 Pa. 307, 313, 100 A.2d 378, 380 (1953). This Court has long held that the evidence necessary to establish damages is no more than "the best evidence available." *McCleary v. Pittsburg Rys. Co.*, 47 Pa.Super. 366, 372, 1911 WL 4591, *4 (1911).

██ In *McCleary*, this Court was faced with a similar challenge to an award arising from the death of a five-year-old child under the wrongful death statute at the time, the Act of April 15, 1851, P.L. 69. The Superior Court recognized the difficulty in proving damages when the claim concerned the death of a minor child:

> But in other cases, of which the present is an illustration, the life lost may have been cut off in infancy or spent itself along the lines of those social, domestic or moral human relations that exhibit no commercial side. In such cases when a plaintiff has proven all of the relevant facts susceptible of affirmative proof, is he to be denied the benefits of the statute because he cannot prove more? We are unable to reach such a conclusion.

*Id.*, 47 Pa.Super., at 372, 1911 WL, at *4. In rejecting the appellant's argument, the Court employed the following reasoning:

> Upon the trial of the present case the jury had before them as witnesses both the father and mother of the deceased child; they had evidence of the nature of the occupation of the father and thus of his general social condition; they had the ages of each parent, showing that they were in the prime of life; . . . . Beyond these matters, shown by direct evidence, the jury had the right to apply to them the results of the observation and experience which are the common inheritance of intelligent men.

*Id.*, 47 Pa.Super., at 373, 1911 WL, at *5. What was true regarding the best available evidence of the value of a five-year-old child's life is even more true of an infant whose fatal injuries were sustained at birth. A jury is permitted to utilize the common inheritance of intelligent human beings in evaluating the meager evidence available regarding the value of the infant's life.

██ In the present case, Appellees presented the testimony of Hyseem's father, who was 30 years-old at the time of trial. *See* N.T., Trial, 2/8/2011, at 32–33. He testified to the existence of a close-knit family. *See id.*, at 66. Hyseem's older brother, Vyshan, also testified. *See id.*, at 74–75. Vyshan stated that he and his younger brother helped care for Hyseem. *See id.*, at 77. Furthermore, the brothers played games with Hyseem. *See id.*, at 78.

While this and other circumstantial evidence admitted at trial is certainly far from definitive, we conclude that no better evidence was available to Appellees. Thus, as in *McCleary*, this evidence, as the best available, was sufficient to allow the jury to utilize its "common inheritance" to assign a value to Hyseem's life. Accordingly, we can discern no error in the trial court's instructions to the jury regarding the damages available under the Act, and therefore no relief is merited on appeal for these issues.

Next, HUP and Dr. Chen contend that the trial court erred in concluding that the verdict was not against the weight of the evidence presented at trial. Specifically,

Appellants argue that the great weight of the evidence at trial established that Hyseem's brain injury occurred prior to his arrival at HUP.

 As stated by our Supreme Court:

> In evaluating a claim that a verdict is against the weight of the evidence, Pennsylvania courts employ a shocks-the-conscience litmus. The trial judge's authority to award a new trial on weight-of-the-evidence grounds is narrowly circumscribed on account of the principle that credibility questions are exclusively for the fact finder. The matter is couched as discretionary in the trial court, with its role in the assessment being afforded primacy in view of its substantially closer vantage to the evidentiary presentation as compared to that of an appellate court. Relief is available in an appellate court only if it can be said that the trial court acted capriciously or palpably abused its discretion.

*Com., Dept. of General Services v. U.S. Mineral Products Co.*, 598 Pa. 331, 341–342, 956 A.2d 967, 973–974 (2008) (footnote and citations omitted).

 HUP and Dr. Chen focus their argument on the evidence of arterial blood gas test results that are arguably inconsistent with Appellees' expert opinions. Appellants argue that it was uncontested at trial that these results were not consistent with Hyseem suffering an injury after arriving at HUP. However, there was conflicting expert testimony at trial regarding the authenticity of these test results. Appellees' experts opined that the test results were inconsistent with the clinical picture of a child that was severely depressed and not breathing at the time of birth. *See*

N.T., Trial, 2/2/2011, at 72–79; N.T., Trial, 2/7/2011, at 84. Furthermore, the authenticity of the test request was brought into question during the cross-examination of the requesting nurse. *See* N.T., Trial, 2/10/2011, at 63–66.

After closely reviewing this record in its opinion, the trial court stated:

> At this post-trial juncture, the issue is whether there was enough evidence in the record to support the jury's verdict. The response is a resounding "yes."

Trial Court Opinion, 10/18/2011, at 14. Because there was conflicting evidence presented at trial, which was properly presented to the fact-finder, we cannot conclude that the trial court abused its discretion. Therefore, no relief is warranted to HUP or Dr. Chen on this issue.

 In their fourth issue on appeal, HUP argues [1] that the trial court erred in concluding that Appellees presented sufficient evidence at trial to link the alleged negligence of HUP's agents to the injuries suffered by Hyseem. Specifically, HUP contends that there is no evidence of record that can connect Dr. Diane Chavkin's or HUP's nurses' failure to determine that Hyseem was in a transverse, or back down, position when Hatwood first presented at the hospital that morning. However, review of the trial transcripts reveals sufficient evidence which allowed the jury to find that the negligence of HUP's agents caused, or contributed to, Hyseem's injuries.

Appellees' expert, Dr. James Mollick, testified that when a baby is in a transverse position, birth by caesarean section is required to protect the health of the

---

1. Appellants' brief does not explicitly set forth why Dr. Chen would be entitled to relief pursuant to the arguments set forth in this section of the brief beyond a bald allegation that the failure to link Hyseem's injuries to the alleged breaches of duty committed by HUP's agents entitles Dr. Chen to a new trial "on all issues." Appellants' brief, at 39.

mother and the baby. *See* N.T., Trial, 2/7/2011, at 35. Dr. Mollick also opined that Hyseem was transverse when Hatwood first arrived at the hospital that morning, as Hyseem could not have moved after Hatwood's water burst. *See id.,* at 48–49. Dr. Mollick opined that the attending physicians and nurses should have determined Hyseem's position upon their initial examination that morning. *See id.,* at 28, 38, 50–51. Furthermore, Dr. Mollick testified that the delay in performing the caesarean section on Hatwood fell below the applicable standard of care and led to oxygen deprivation and brain damage to Hyseem. *See id.,* at 71–73. This testimony, which the jury was free to consider, was sufficient to support the jury's conclusion that Hyseem's injuries were causally related to the negligence of HUP's agents. Accordingly, we conclude that this issue merits no relief on appeal.

Next, HUP and Dr. Chen argue that the trial court erred in allowing the jury to consider the acts or omissions of Dr. Chavkin and HUP's nurses in determining liability. Appellants base their argument upon their contention that Dr. Mollick's expert testimony was limited to opining that "the cause of the injury was the decision not to treat the vaginal bleeding as a medical emergency and deliver the baby within 10 minutes thereof." Appellants' brief, at 41. However, as noted above, Dr. Mollick also opined that Dr. Chavkin and the nursing staff were negligent in not preparing for caesarean section after the initial evaluation of Hatwood. Since Appellants' argument is based on an erroneous interpretation of the record, we again conclude that this argument merits no relief on appeal.

■■■ In their sixth issue on appeal, Appellants contend that Dr. Mollick's expert testimony was not based upon evidence of record. We note that our stan-dard of review for evidentiary rulings is a narrow one:

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*Reott v. Asia Trend, Inc.,* 7 A.3d 830, 839 (Pa.Super.2010). The admissibility of expert testimony is soundly committed to the discretion of the trial court, and the trial court's decision will not be overruled absent "a clear abuse of discretion." *Helpin v. Trustees of Univ. of Pennsylvania,* 969 A.2d 601, 617 (Pa.Super.2009), *aff'd,* 608 Pa. 45, 10 A.3d 267 (2010).

■■■ HUP and Dr. Chen argue that Dr. Mollick's testimony on the issue of the timing of Hyseem's transition to a transverse position as well as Dr. Mollick's testimony regarding the labeling of blood gas test results have no support in the record. However, it is clear that Dr. Mollick formed opinions, based upon his specialized knowledge of the issue at hand, upon his review of the records from Hyseem's birth. For example, Dr. Mollick testified on Hyseem's positioning as follows:

> It's my opinion that the baby was in a transverse position when the baby presented to the hospital.... None of the material up to that point, this examination here, the abdominal examination here, indicated that the baby's head was down; didn't indicate what part was down.
>
> And as we'll see in the records presented later on, none of the documentation by any physician or nurse indicates what the presenting part was; no documentation of what the part

that was presenting down in the pelvis was.

But then what we had was, when the delivery time came, was the baby sideways. Okay? And one thing we do know is this: Is that once the membranes rupture, because the baby's encased in a bag of fluid, as soon as the membranes rupture and that fluid goes away, that baby becomes squished.

It's almost like being in a straight jacket, because the fluid is what keeps the baby kind of floating in the uterus. Well, imagine what happens when that water all drains away. The baby is now compressed by the muscle in that uterus. The baby can't move.

So if the baby is sideways when they delivered, and all the water had drained away when she came into the hospital, how could that baby move to any other position?

N.T., Trial, 2/7/2011, at 48–49. This testimony, admittedly contradictory to the Appellants' position at trial, indicates that Dr. Mollick's opinion was based upon the application of his professional judgment to facts of record.

Similarly, Dr. Mollick proffered the following basis for his opinion on the labeling of the cord blood gas sample:

When I reviewed . . . the records, I was given the cord blood sample, or values, to review as part of the record. And my first impression was the values were venous, in that they didn't fit with the clinical presentation and how the baby was when it was delivered, along with everything else.

And then I reviewed the results that were presented to me as part of the records.

. . .

Basically, what you see here, well, the records indicate the operative record indicated that cord blood gas was ob-

tained. That's what the operative record said.

It didn't say "Artery," didn't say "Vein," said "Cord blood gas."

So that's where I looked first, to see what exactly they did. And it doesn't say when it was obtained, what time, who obtained it. So I don't know who obtained it, I don't know how it was obtained, or anything.

So it just said "Cord blood." Then I read the deposition testimony to find out, well, who obtained it, hoping that that would tell me. I do know that Dr. Chen did not obtain the sample. So the most experienced person in the operating room did not obtain the cord blood sample.

*See id.*, at 84–86. Again, this testimony consists of Dr. Mollick applying his professional judgment to facts of record. Since we conclude that Dr. Mollick's expert opinions were based upon his professional evaluation of facts in the record, Appellants' sixth issue on appeal merits no relief.

 Next, HUP and Dr. Chen contend that the trial court erred in denying remittitur on the damages awarded by the jury. Our review of a claim challenging the jury's determination of damages is highly circumspect:

The duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. If the verdict bears a reasonable resemblance to the damages proven, we will

not upset it merely because we might have awarded different damages.

*Betz v. Erie Insurance Exchange,* 957 A.2d 1244, 1264 (Pa.Super.2008) (internal citations omitted). As noted previously, the type and amount of evidence available to establish damages due to the death of an infant is necessarily extremely limited. Acknowledging the constraints that flow from a case such as this, we cannot conclude that an award of 1.5 million dollars for non-economic damages bears no reasonable relation to the loss of a child's life. Accordingly, this argument merits no relief.

■■■ Finally, HUP and Dr. Chen argue that the trial court erred in instructing the jury on the concept of "increased risk of harm." As noted previously, our standard of review is as follows:

Under Pennsylvania law, our standard of review when considering the adequacy of jury instructions in a civil case is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue that error in a charge will be found to be a sufficient basis for the award of a new trial.

*Patton v. Worthington Associates, Inc.,* 43 A.3d 479, 490 (Pa.Super.2012) (citation omitted). "Further, a trial judge has wide latitude in his or her choice of language when charging a jury, provided always that the court fully and adequately conveys the applicable law." *Id.* (citation omitted).

Appellants argue that there was no testimony to support a jury instruction on the issue of whether the Appellants had increased the risk of harm to Hyseem. However, based upon our review of the trial testimony, we cannot conclude that the trial court committed an abuse of discretion.

■■■ To prevail in a professional negligence action, a plaintiff must plead and prove the four elements of negligence:

(1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of that harm.

*Corrado v. Thomas Jefferson University Hospital,* 790 A.2d 1022, 1030 (Pa.Super.2001) (citation omitted). To establish the causation element in a professional negligence action,

[T]he plaintiff is *not* required to show that the defendant's negligence was the actual "but for" cause of the plaintiff's harm. Rather, under the "increased-risk-of-harm" standard, the plaintiff must introduce sufficient evidence that the defendant's conduct increased the risk of the plaintiff's harm. Our Supreme Court has provided the following guidance in applying this standard:

Once a plaintiff has demonstrated that the defendant's acts or omissions ... have increased the risk of harm to another, such evidence furnishes the basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.

In other words, once the plaintiff introduces evidence that a defendant-physician's negligent acts or omissions increased the risk of the harm ultimately sustained by the plaintiff, then the jury must be given the task of balancing the probabilities and determining, by a preponderance of the evidence, whether the physician's conduct was a substantial

factor in bringing about the plaintiff's harm.

*Winschel v. Jain,* 925 A.2d 782, 788–789 (Pa.Super.2007), *appeal denied,* 596 Pa. 709, 940 A.2d 366 (2008) (citations omitted).

In the case currently before us, Dr. Brian Eric Woodruff, a pediatric neurologist, testified as to the nature of the injury suffered by Hyseem. He opined that Hyseem sustained a hypoxic brain injury as a result of lack of "oxygen in the blood or the blood to his brain in order to keep parts of his brain alive, and, subsequently, those parts of his brain that didn't get the nutrients, the oxygen that they needed at that time, were damaged permanently." *See* N.T. 2/2/11, at 25. Dr. Woodruff continued that the "hypoxic ischemic encephatopathy" was brought about during the "abruption that the child sustained. The child—the abruption, meaning the placenta pulled away from the uterus." *Id.* At 30.

Dr. Mollick correlated the abruption to the negligence of HUP and Dr. Chen. Dr. Mollick testified that once there were signs of placental abruption, the Appellants were under a duty to deliver the baby as soon as possible:

> Because what happens in a placental abruption is the placenta is separating from the uterus; and when that placenta separates from the uterus, it's also separating from all the blood and oxygen that mom's providing to the baby.

*See* N.T. 2/7/11, at 73. Ultimately, it was Dr. Mollick's opinion that the failure to quickly perform a caesarean section to remove Hyseem resulted in Hyseem's injuries. *Id.* At 92–93.

In her comprehensive memorandum denying the motions for post-trial relief, the learned trial judge, following her review of the above cited evidence, concluded: "These plaintiffs presented ample evidence for the jury to conclude that the conduct of Dr. Chen, ... and the nurses at HUP deviated from the appropriated standards of care and that their conduct increased the risk of harm and caused the harm to Baby Hyseem." Memorandum, 10/18/11, at 9. We can find no error in her analysis.

As we conclude that none of HUP's and Dr. Chen's arguments on appeal merit relief, we affirm the judgment.

Judgment affirmed. Jurisdiction relinquished.