J-A01019-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ROBERT KIMBLE, ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF SHARON KIMBLE AND ROBERT KIMBLE IN HIS OWN RIGHT | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | No. 617 EDA 2019 |
| LASER SPINE INSTITUTE, LLC, LASER SPINE INSTITUTE PHILADELPHIA, LASER SPINE INSTITUTE OF PENNSYLVANIA, LLC, GLENN RUBENSTEIN, M.D., | : : : : : : : | |
| APPEAL OF: LASER SPINE INSTITUTE, LLC, | : : | |

Appeal from the Judgment Entered January 17, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 16-00569

| | | |
|---|---|---|
| ROBERT KIMBLE, ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF SHARON KIMBLE AND ROBERT KIMBLE IN HIS OWN RIGHT | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | No. 618 EDA 2019 |
| LASER SPINE INSTITUTE, LLC, LASER SPINE INSTITUTE PHILADELPHIA, LASER SPINE INSTITUTE OF PENNSYLVANIA, LLC, GLENN RUBENSTEIN, M.D., | : : : : : : : | |
| APPEAL OF: GLENN RUBENSTEIN, M.D., | : : | |

Appeal from the Judgment Entered January 17, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 16-00569

BEFORE:   NICHOLS, J., MURRAY, J., and COLINS, J.*

MEMORANDUM BY MURRAY, J.:                              Filed: April 9, 2020

Laser Spine Institute, LLC, Laser Spine Institute Philadelphia, Laser Spine Institute of Pennsylvania, LCC (collectively, LSI) and Glenn Rubenstein, M.D. (Dr. Rubenstein) (collectively, Appellants) appeal from the judgment entered in favor of Appellee Robert Kimble (Kimble) in his own right and as administrator and personal representative of the estate of Sharon Kimble (Decedent).  After careful consideration, we affirm Appellants' liability, but vacate the judgment and remand to the trial court for a new trial limited to the issue of damages.

Kimble and Decedent married in 2003, and following a divorce in 2012, remarried later that same year.  Throughout the course of their marriage, Decedent suffered from debilitating back pain for which she took numerous narcotic and other pain medications.  In 2013, Decedent sought treatment for her back from LSI.

On January 29, 2014, Decedent underwent spine surgery at LSI's Wayne, Pennsylvania operating facility.  Dr. Rubenstein was Decedent's anesthesiologist.  The surgery began around 7:20 a.m. and ended around

_____

* Retired Senior Judge assigned to the Superior Court.

8:40 a.m. Decedent was discharged approximately two hours later at 10:40 a.m. LSI instructed Decedent to return in two days, on January 31, 2014, for a post-operative checkup. Because Kimble and Decedent did not live in the area, they stayed at a nearby hotel where she could recuperate until her post-operative appointment.

At 4:49 p.m. on the day of the surgery, Kimble called the hotel's front desk seeking emergency assistance because Decedent was not breathing. Hotel staff, followed by the police and emergency medical personnel, went to Decedent's hotel room where they found her unresponsive, with no vital signs. Emergency personnel transported Decedent to the local hospital where she was pronounced dead.

Decedent's autopsy revealed the presence of pulmonary edema, a condition commonly observed in drug deaths involving opiates. The toxicology report also revealed the presence of multiple opioids and several central nervous system depressants (CNSDs), including Dilaudid, Flexiril, Oxycontin or Oxycodone, and Donnatal. Based on these findings, the coroner concluded that Decedent's cause of death was the "synergistic" effect of multiple CNSDs in her blood.

Kimble initiated the underlying matter on January 26, 2016 by filing a writ of summons on his own behalf and on behalf of Decedent's estate. On July 26, 2017, Kimble filed a complaint in which he raised claims under the Pennsylvania Wrongful Death and Survival Acts, 42 Pa.C.S.A. §§ 8301-8302,

against Appellants. The case eventually proceeded to trial, from March 19 through March 28, 2018. On March 28, 2018, the jury returned a verdict in favor of Kimble and apportioned liability between LSI and Dr. Rubenstein 65% and 35%, respectively. The jury awarded Kimble 10 million dollars in Wrongful Death Act damages and 10 million dollars in Survival Act damages.

Appellants filed timely post-trial motions. On December 28, 2018, the trial court granted Appellants' request for judgment notwithstanding the verdict (JNOV) as to Kimble's 10 million dollar Survival Act award, denied Appellants' request for JNOV as to the 10 million dollar Wrongful Death Act award, and denied Appellants' post-trial motion in all other respects. On January 17, 2019, the trial court entered judgment in favor of Kimble and against Appellants. Appellants' timely appeal followed.

Four of the five issues LSI raises in their appellate brief are identical to the issues Dr. Rubenstein presents in his appellate brief. The sole issue unique to LSI is their first issue. Therefore, we reproduce LSI's statement of the questions involved, as it encompasses all of the issues Appellants raise on appeal:

> 1. Whether Laser Spine Institute LLC, Laser Spine Institute of Pennsylvania, LLC, and Laser Spine Institute-Philadelphia are entitled to JNOV and vacation of the judgment, where none of the three were found liable by the jury and, thus, there was no basis for the Prothonotary to enter judgment against them?
>
> 2. Whether [Appellants] are in any event entitled to JNOV as a result of [Kimble]'s failure to present sufficient evidence of a standard of care, breach, causation and damages against Dr.

Rubenstein or any evidence to establish that [LSI is] vicariously liable for his conduct?

3. Whether [Appellants] are entitled to JNOV or a new trial where the only theory [Kimble] pursued against "Laser Spine Institute" was that it was vicariously liable for Dr. Rubenstein's conduct and, thus, the jury's apportionment of 65% liability against "Laser Spine Institute" was not based on sufficient evidence and/or was against the weight of the evidence?

4. Whether [Appellants] are entitled to a new trial as a result of the trial court's errors regarding use, and cross-examination of [Kimble] about, [Decedent]'s Protection from Abuse Order and the Kimbles' divorce decree?

5. Whether [Appellants] are entitled to JNOV, a new trial or remittitur as a result of [Mr. Kimble]'s failure to offer sufficient evidence to prove damages and where the weight of the evidence does not support the verdict under Pennsylvania's Wrongful Death Act?

LSI's Brief at 5-6.

First, LSI argues that the trial court erred in entering judgment against Laser Spine Institute, LLC, Laser Spine Institute Philadelphia, and Laser Spine Institute of Pennsylvania, LLC because the jury returned a verdict against "Laser Spine Institute" and did not specifically list each of the three aforementioned entities on the verdict slip. LSI contends that consequently, the judgment entered against Laser Spine Institute, LLC, Laser Spine Institute Philadelphia, and Laser Spine Institute of Pennsylvania, LLC is void.

In rejecting this claim, the trial court explained:

Defense trial counsel specifically requested and agreed to vicarious liability for all three (3) of the named Laser Spine entities . . . and agreed to collectively refer to them on the verdict slip as "Laser Spine Institute" and repetitively and collectively referred to them throughout trial and post-trial as "Laser Spine Institute" or

"LSI." Defense trial counsel sought non-suit on behalf of "Laser Spine Institute" at the close of Plaintiffs' case and DID NOT seek a directed verdict on behalf of each individual corporate defendant prior to jury discharge because of any now claimed misnomer issue . . . Furthermore, [d]efense trial counsel waived contesting any inconsistent verdict . . . by not raising it prior to discharge of the trial jury. Finally, this issue is again waived since it was not presented in a timely post-trial motion.

Trial Court Order, 2/22/19, at 1 n.1.

We agree with the trial court's determination that LSI failed to preserve this issue for appellate review because they did not raise it in their post-trial motions. *See* Pa.R.C.P. 227.1(b)(2) ("[P]ost-trial relief may not be granted unless the grounds therefor . . . are specified in the motion. . . . Grounds not specified are deemed waived[.]"). Moreover, even if LSI had not waived this issue, the record is replete with instances demonstrating that the parties commonly referred to Laser Spine Institute, LLC, Laser Spine Institute Philadelphia and Laser Spine Institute of Pennsylvania, LLC in the collective as "Laser Spine Institute" or "LSI." As the trial court states, the verdict slip, to which both parties agreed and LSI did not object, refers to Laser Spine Institute, LLC, Laser Spine Institute Philadelphia and Laser Spine Institute of Pennsylvania, LLC collectively as "Laser Spine Institute." Proposed Verdict Sheet of Defendants Laser Spine Institute Philadelphia, Laser Spine Institute Pennsylvania, Laser Spine Institute LLC and Glen Rubenstein, M.D., 3/27/18; N.T., 3/28/18, at 2. Likewise, in their memorandum of law in support of their post-trial motions, LSI repeatedly referred to Laser Spine Institute, LLC, Laser Spine Institute Philadelphia and Laser Spine Institute of Pennsylvania, LLC

collectively as LSI. **_See generally_** Memorandum of Law in Support of Defendants Laser Spine Institute, LLC, Laser Spine Institute Philadelphia and Laser Spine Institute of Pennsylvania, LLC Post-Trial Motions, 6/7/18.

Thus, the record supports the trial court's determination that throughout the entirety of trial, both the parties and trial court considered Laser Spine Institute, LLC, Laser Spine Institute Philadelphia and Laser Spine Institute of Pennsylvania, LLC to be one entity, "Laser Spine Institute" or "LSI," and referred to them as such. LSI's attempts to argue otherwise are disingenuous and belied by the record.

Second, Appellants challenge the trial court's decision to deny their request for judgment notwithstanding the verdict (JNOV). We analyze issues relating to JNOV according to the following standard:

> The propriety of a JNOV is a question of law, and therefore, our scope of review is plenary. **_Foster v. Maritrans, Inc._**, 790 A.2d 328, 330 (Pa. Super. 2002). When the denial of JNOV is challenged on the basis that the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant, as here, this Court reviews the evidentiary record and must conclude "that the evidence was such that a verdict for the movant was beyond peradventure." **_Reott v. Asia Trend, Inc._**, 7 A.3d 830, 835 (Pa. Super. 2010). Moreover,

> > In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standards of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case.

> Further, the standard of review for an appellate court is the same as that for a trial court.

*Reott*, 7 A.3d at 835.

*Corvin v. Tihansky*, 184 A.3d 986, 990 (Pa. Super. 2018).

Appellants argue that the trial court erred in failing to grant JNOV. Specifically, Appellants assert that Kimble did not establish a *prima facie* case of negligence against Dr. Rubenstein because Kimble failed to present evidence establishing the applicable standard of care. Consequently, Appellants contend that Kimble was unable to establish a breach of the standard of care or causation, *i.e.*, that a breach of the standard of care caused Decedent's death. LSI further argues that they are entitled to JNOV because Kimble did not establish that they were vicariously liable for Dr. Rubenstein's conduct. LSI asserts that Kimble failed to prove LSI was Dr. Rubenstein's employer.

Before we address the merits of Appellants' arguments, we must determine whether the claims were preserved for review. We have stated:

> This Court requires a motion for directed verdict during trial as a prerequisite to a post-trial motion for JNOV based on the state of the evidence. *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 570 (Pa. Super. 2006). This approach has the salutary effect of submitting the issue to the trial judge for initial evaluation during trial, when the proofs are still fresh. *Commonwealth v. U.S. Mineral Prods.*, 927 A.2d 717, 725 (Pa. Cmwlth. 2007). The right to seek JNOV likewise is preserved if the moving party requests, and is denied, a binding jury instruction. *See* Pa.R.C.P. 227.1(b)(1); *Hayes v. Donohue Designer Kitchen, Inc.*, 818 A.2d 1287, 1291 n.4 (Pa. Super. 2003) ("[C]ases indicate that in order to preserve the right to request a JNOV post-trial[,] a litigant

must first request a binding charge to the jury or move for directed verdict at trial."). **Thomas Jefferson**, 903 A.2d at 570.

**Tihansky**, 184 A.3d at 990-91.

Here, the trial court concluded that Appellants waived their right to raise post-trial a motion for JNOV:

> [Appellants] . . . contend that they have preserved their rights to request JNOV by way of proposed binding jury instructions. Although [Appellants] did submit a proposed directed verdict charge (**See** "requests for binding instructions . . ." at paragraphs 1., 2. and 3., filed March 16, 2018 at docket reference number 185), counsel were informed that the [c]ourt was not inclined to give non-standard jury instructions. (**See** N.T. 3/27/2018 at page 40.) There was no formal denial of those specific instructions pursued by counsel for [Appellants] nor were any specific denial rulings made of record. (**See** N.T. 3/27/2018 pages 24 through 42; N.T. 3/28/2018 pages 2 through 6; pages 79 through 82; pages 89-90). Despite the filing of the request for binding instructions, the absence of a specific request and ruling and/or objection on the binding instruction request does not preserve the issues for JNOV. **See Thomas Jefferson University v. Wapner**, 903 A.2d 565 (Pa. Super. 2006); **see also Faherty v. Gracias**, 874 A.2d 1239 (Pa. Super. 2005); **Corvin v. Tihansky**, 184 .A.3d 986 (Pa. Super. 2018). [Appellants] failed to make objection, including at the conclusion of the [c]ourt's final charge to the jury and prior to the discharge of the jury. [Appellants] have failed to preserve their right to JNOV.

Trial Court Order, 12/31/18, at 3 n.2. Kimble likewise argues that Appellants have failed to preserve their JNOV claims.

Following careful review of the record, we agree with both the trial court and Kimble that Appellants have waived nearly all of their JNOV claims. First, there is no dispute that Appellants never moved for a directed verdict on any issue. Appellants claim that they preserved their right to seek JNOV by moving for non-suit at the close of Kimble's case-in-chief. **See** LSI's Brief at

27 n.15. While Appellants did motion for non-suit at the close of Kimble's case, the only grounds that Appellants specified in the oral motion was that Kimble failed to present evidence that Dr. Rubenstein was an agent or employee of LSI, and thus Kimble could not establish vicarious liability on behalf of LSI. *See* N.T., 3/26/18, at 53-54. Appellants, however, ultimately conceded that Dr. Rubenstein was an employee of LSI. N.T., 3/28/18, at 52. Thus, LSI plainly stated that they no longer contest the only basis upon which they had previously moved for non-suit. *See id.* As Appellants did not move for nonsuit on any other basis, a motion for nonsuit cannot serve as the means by which they preserved their right to move for JNOV.

Second, Appellants failed to preserve their right to move for JNOV by requesting a binding instruction. The record reflects that prior to trial, Appellants filed proposed points for charge that included three instructions generally stating that the jury's verdict "must be for the Defendants . . . and against the Plaintiffs." Request for Binding Instructions and in the Alternative, Points for Charge of Defendants, Laser Spine Institute of Philadelphia, Laser Spine Institute of Pennsylvania, Laser Spine Institute, LLC, and Glen Rubenstein, M.D., 3/16/18, ¶¶ 1-3. It is these three points of charge upon which Appellants base their assertion that they preserved their JNOV claim.

At the conclusion of evidence in this case, the parties conferred before the trial court to discuss jury instructions. Noting that all sides had submitted their points of charge, the trial court permitted each party to raise specific

objections regarding the opposing party's jury instructions. *See* N.T., 3/27/18, at 24-32. The court and the parties then proceeded to conduct a detailed assessment of the instructions of both sides. *See id.* On numerous occasions, Appellants' counsel raised objections to several of Kimble's points of charge. *See id.* at 24-40. The trial court sustained Appellants' objections in certain instances and denied them in several others. *See id.*

When the issue of non-standard instructions arose, the following occurred:

> THE COURT: What about [Appellants'] instructions?
>
> [Kimble's Counsel]: Your Honor, I have them right here. And with the exception -- most of them are standard. There are several, however, that I take objection to.
>
> THE COURT: If they're not standard, I usually don't give them.
>
> [Kimble's Counsel]: If you're not going to be giving any of the non-standard instructions, then I think we are okay.

*Id.* at 40.

As stated above, the trial court found that because Appellants did not specifically request the inclusion of the binding instructions in the points of charge following trial, "[t]here was no formal denial of those specific instructions pursued by counsel for [Appellants] nor were any specific denial rulings made of record." Trial Court Order, 12/31/18, at 3 n.2. We agree. The trial court did not deny Appellants' proposed binding instructions. Instead, the court stated that it "usually" does not give non-standard instructions. N.T., 3/27/18, at 40. Thus, not only did the trial court not make

- 11 -

an explicit ruling with respect to the specific binding instructions at issue, at no point during this post-trial conference did Appellants attempt to seek the inclusion of the binding instructions in the court's points of charge. This Court has made clear that "if the [trial] court rules against a particular jury charge, that party need not 'take exception' to the ruling." **Faherty v. Gracias**, 874 A.2d 1239, 1249 (Pa. Super. 2005); **see also Jones v. Montefiore Hosp.**, 431 A.2d 920, 923 n.5 (Pa. 1981) (stating that "[a]lthough no specific objection was made at trial to the charge given, appellants' exception to the trial court's refusal to charge as requested on causation was sufficient to put that charge before us for appellate review"). In this case, however, the record does not include an objection or exception, and therefore, a ruling against the particular binding jury instructions Appellants submitted prior to trial. **See Faherty**, 874 A.2d at 1249 (stating that mere submission of a particular charge is not enough; "a ruling must be made").

Accordingly, the record indicates that the trial court did not deny Appellants' binding instructions. Appellants, through their own inaction, indicated that they decided not to seek inclusion, in the points of charge, of the binding instructions that they submitted before trial, despite the clear opportunity and ability to do so. Consequently, there was never a ruling denying any binding instructions. We thus conclude that Appellants did not preserve their right to seek JNOV on any claim post-trial.

Third, Appellants argue that they are entitled to a new trial because the evidence was insufficient to support a verdict reflecting that LSI was 65% liable for Decedent's death. Appellants assert that because Kimble's claim against LSI was one of vicarious liability, and thus, LSI and Dr. Rubenstein were not joint tortfeasors, LSI could not be 65% liable for Decedent's death and the trial court erred by allowing the jury to apportion liability between LSI and Dr. Rubenstein on the verdict slip. Appellants emphasize that they are not challenging the wording of the verdict slip.

Our Supreme Court has explained the theory of vicarious liability:

> The rules of vicarious liability respond to a specific need in the law of torts: how to fully compensate an injury caused by the act of a single tortfeasor. Upon a showing of agency, vicarious liability increases the likelihood that an injury will be compensated, by providing two funds from which a plaintiff may recover. If the ultimately responsible agent is unavailable or lacks the ability to pay, the innocent victim has recourse against the principal. If the agent is available or has means to pay, invocation of the doctrine is unnecessary because the injured party has a fund from which to recover.

*Keffer v. Bob Nolan's Auto Serv., Inc.*, 59 A.3d 621, 637 (Pa. Super. 2012) (quoting *Mamalis v. Atlas Van Lines, Inc.*, 560 A.2d 1380, 1383 (Pa. 1989)). Furthermore,

> The system of contribution among joint tortfeasors . . . has arisen completely apart from the system of vicarious liability and indemnity and meets an entirely distinct problem: how to compensate an injury inflicted by the acts of more than one tortfeasor. Unlike the liability of a principal, the liability of a joint tortfeasor is direct (because the tortfeasor actually contributed to the plaintiff's injury) and divisible (since the conduct of at least one other also contributed to the injury).

- 13 -

*Mamalis*, 560 A.2d at 1383 (quotation and citation omitted).

Here, the verdict slip asked the jury to apportion liability between LSI and Dr. Rubenstein and was likely flawed. However, Appellants are not entitled to relief. Pursuant to *Mamalis* and *Keffer*, LSI could not be 65% liable for Decedent's death. Rather, based on the trial court's vicarious liability instruction and the jury's finding that Dr. Rubenstein was negligent, LSI is 100% liable for Decedent's death under a vicarious liability theory. *See Keffer*, 59 A.3d at 637. Regardless of the mistake on verdict slip, LSI was 100% liable for Decedent's death. Appellants' general, unsupported assertions that they were prejudiced by increased damages that resulted from the trial court permitting the jury to apportion liability between LSI and Dr. Rubenstein on the verdict slip are unavailing. Indeed, Appellants cite no authority that supports this proposition.

To the extent Appellants are challenging the wording on the verdict slip, this claim is waived. Immediately prior to closing arguments, Appellants' counsel specifically expressed that he had no issue with the verdict slip:

THE COURT: Here are the verdict slips.

(A discussion was held off the record.)

[Kimble's Counsel]: Thank you, your Honor.

[Appellants' Counsel]: Fine, your Honor.

[Kimble's Counsel]: The jury verdict slip is acceptable to the plaintiffs.

- 14 -

THE COURT: Good. And you too, [Appellants' Counsel]; is that correct?

[Appellants' Counsel]: That is correct, your Honor.

THE COURT: Good.

N.T., 3/28/18, at 2.

The record reflects that Appellants raised no issue with the verdict slip at trial. Consequently, Appellants cannot challenge the propriety of the verdict slip on appeal. ***See Oxford Presbyterian Church v. Weil-McLain Co.***, 815 A.2d 1094, 1105 (Pa. Super. 2003) (holding that the appellant's failure to object to the verdict slip at trial waived a challenge to it on appeal). Thus, Appellants third issue lacks merit.

Fourth, Appellants argue that the trial court abused its discretion in excluding documentation of the 2012 protection from abuse (PFA) order Decedent obtained against Kimble and the couple's divorce decree from the same year. Appellants sought to utilize this evidence to explore the specific nature of the marital discord that existed between Kimble and Decedent. Appellants assert that the exclusion of this evidence was an abuse of discretion because it was relevant for the jury in awarding non-economic damages to Kimble.

We recognize:

When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition,

- 15 -

for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*Lykes v. Yates*, 77 A.3d 27, 32 (Pa. Super. 2013) (quotations and citation omitted). "An abuse of discretion is not merely an error of judgment. It requires a showing of manifest unreasonableness, partiality, ill-will, or such lack of support as to be clearly erroneous. Under this standard, the party challenging the trial court's discretion on appeal bears a heavy burden." *SLT Holdings, LLC v. Mitch-Well Energy, Inc.*, 217 A.3d 1248, 1251 (Pa. Super. 2019) (quotations and citation omitted).

Prior to Kimble's testimony, the trial court addressed Appellants' counsel's cross-examination of Kimble regarding his relationship with Decedent, the PFA order, and the divorce decree:

> THE COURT: . . . This is an order and in case I really wasn't clear, if [Appellants' Counsel] is going to question your client about the nature of their relationship in order to present evidence to the -- prior to her death in order for the jury to determine what your client is entitled to for wrongful death after her death, then he can ask questions, this gives him the legal basis to ask the questions in good faith. And he is stuck with the answer unless he can properly prove it.
>
> How [Kimble] wants to answer is up to him. If he wants to deny it, that he didn't have a conviction, if he wants to deny that the order says what the order says, and [Appellants' Counsel] is able to properly establish it, it will be devastating. I thought I was pretty clear about that.

N.T., 3/22/18, at 11. In other words, while the trial court was willing to permit Appellants' counsel to question Kimble about the PFA and divorce, Appellants were limited to Kimble's answers. *See id.* The trial court would not permit

Appellants' counsel to use the PFA order or the divorce decree to contradict Kimble's testimony or get into the specific details pertaining to the allegations underlying those documents because the allegations were hearsay. ***See*** N.T., 3/19/18, at 16.

> Appellants' Counsel cross-examined Mr. Kimble as follows:
>
> [BY Appellants' Counsel]:
>
> Q.  Well, let me ask it this way.  Was there not at the time of your wife's death, in fact, a protection from abuse order still in effect against you?
>
> [Kimble's Counsel]:  Objection.
>
> THE COURT:  Overruled.
>
> THE WITNESS:  Yes.
>
> BY [Appellants' Counsel]:
>
> Q.  Okay. And that protection from abuse order arose from events that occurred in 2011; is that right?  I think it was 11-11, as a matter of fact.
>
> A.  I guess. I don't know. I don't know what time it happened.
>
> Q.  What do you remember about what happened?  Tell us about the events that led to your former wife, Ms. Kimble, filing and requesting that the court enter an order against you protecting her from abuse?
>
> [Kimble's Counsel]:  Objection.
>
> THE COURT:  Sustained.
>
> *     *     *
>
> BY [Appellants' Counsel]:

Q. Was there -- well, let me ask you this, do you recall that at some point in time around the time -- you told us that you were divorced, correct?

A. Yeah, we were divorced, but we got, you know --

Q. I understand that. And that divorce decree became final in early 2012; is that right?

A. Yeah.

Q. Oh. Now, do you recall the events preceding Ms. Kimble filing for divorce which also involved a claim that you had abused her in some fashion?

A. I don't understand what you're talking about.

* * *

Q. Tell me about the events that led up to Sharon Kimble filing for the divorce?

A. To be honest with you, I don't know why she filed for divorce. I didn't even know she filed for divorce. I'm being truthful with you.

Q. That's okay. There was a divorce decree entered against you, correct?

A. Yes, sir. That I don't know. I'm serious. I don't know.

Q. Well, as part of that decree you were ordered, essentially half of your paycheck was going to Ms. Kimble, correct?

A. Well, I didn't find that out until the divorce was final.

Q. Okay. And the basis for her filing for divorce against you was what, sir?

[Kimble's Counsel]: Objection.

THE COURT: Sustained.

[Appellants' Counsel]: May I show him the document, your Honor?

[Kimble's Counsel]: No.

THE COURT: No.

BY [Appellants' Counsel]:

Q. Sir, you're telling us you got a divorce decree that indicated that essentially there was a distribution of property essentially at that time, correct?

A. Right.

\*     \*     \*

Q. Okay. And you do not remember what the basis for the entry of this order was?

[Kimble's Counsel]: Objection.

THE WITNESS: No, I don't. I can't --

THE COURT: Hold on. Overruled.

BY [Appellants' Counsel]:

Q. Do you know the basis for the entry of this order against you, sir?

[Mr. Kimble's Counsel]: Objection.

THE COURT: Overruled.

THE WITNESS: I don't understand what you're trying to say.

\*     \*     \*

[BY Appellants' Counsel]:

Q. Okay. At some point you became aware that there was a judgment of divorce entered against you; is that right?

A. Right.

Q. Okay. And do you recall when you learned that did you read the decree?

A. I don't know if I did or not.

Q. Okay.

[Appellants' Counsel]: Well, if I -- may I refer to it now, your Honor.

[Kimble's Counsel]: No. Objection.

THE COURT: You going to rule and then object?

[Kimble's Counsel]: Objection, your Honor.

THE COURT: Sustained.

BY [Appellants' Counsel]:

Q. If I suggested to you that there was a finding that the divorce was granted on certain grounds of gross neglect and extreme cruelty, would you have any reason to disagree with that, sir?

[Kimble's Counsel]: Objection.

THE WITNESS: Was I --

THE COURT: Sustained.

BY [Appellants' Counsel]:

Q. You're telling us, sir, you have absolutely no understanding of why that divorce decree was entered against you?

A. No, I don't, sir.

[Kimble's Counsel]: Your Honor, again, objection. It's like beating a dead horse here. Same question.

THE COURT: No it is not. Overruled.

BY [Appellants' Counsel]:

Q.  I think you answered but we couldn't hear it.

A.  No, I don't have no recollection of what it was.

N.T., 3/22/18, at 68-77.

Thus, the jury heard testimony indicating that Decedent obtained a PFA order against and a divorce from Kimble in 2012, approximately two years before her death.  The trial court precluded the jury from hearing testimony regarding the specific allegations that lead to the PFA and divorce.  The trial court also precluded Appellants' counsel from confronting Kimble with the documentation of the PFA and divorce.  Appellants, however, fail to cite any authority to support their argument that they were prejudiced by the trial court's decision not to allow Appellants' counsel to confront Kimble with the specific allegations underlying the PFA and divorce.

Evidence pertaining to marital discord is relevant in a wrongful death action, as it relates to the damages for society and comfort that are available in a wrongful death action. *See Rettger v. UPMC Shadyside*, 991 A.2d 915, 932-33 (Pa. Super. 2010), *appeal denied*, 15 A.3d 491 (Pa. 2011) (Explaining that in wrongful death action, members of the decedent's family may recover for the value of decedent's services, which "includes society and comfort").  The record reflects that the jury heard evidence of marital discord in the form of Kimble's testimony acknowledging that Decedent obtained a PFA order and a divorce, and the PFA order was in effect at the time of

- 21 -

Decedent's death. Although we agree with Appellants' assertion that evidence of marital discord is relevant in a wrongful death action, Appellants have not provided us with any authority from this Court or our Supreme Court indicating that they were prejudiced by the trial court's decision to exclude the specifics underlying the PFA order or divorce. Accordingly, we cannot conclude that the trial court abused its discretion.[1]

Finally, Appellants argue that the 10 million dollar damages award to Kimble was so excessive that it shocked the conscience, and the trial court erred in failing to vacate the award. Appellants contend they are entitled to either a new trial or remittitur.

With respect to damages under the Wrongful Death Act, this Court has stated:

> The purpose of the Wrongful Death Statute, 42 Pa.C.S.A. § 8301, is to compensate the decedent's survivors for the pecuniary losses they have sustained as a result of the decedent's death . . . . This includes the value of the services the victim would have rendered

---

[1] Based on our resolution of this issue, we decline to reach the parties' arguments as to whether the PFA order and divorce decree, which were from Ohio, would have been inadmissible as unauthenticated documents from another state. We note that the versions of the PFA order and divorce decree in the record are merely copies, and are not original or certified publications of the documents. **See** Memorandum of Law in Support of Defendants Laser Spine Institute, LLC, Laser Spine Institute Philadelphia and Laser Spine Institute of Pennsylvania, LLC Post-Trial Motions, 6/7/18, Exhibits A and B. These copies are not accompanied by a certificate of authenticity from the officer in custody of the record as required for the admission of out-of-state public records. **See** 42 Pa.C.S.A. § 5328(a), **see also** Pa.R.E. 902(4). Thus, even concluding, *arguendo*, that Appellants were prejudiced by the exclusion of the PFA order and divorce decree, they would not be admissible as they appear in the record before this Court.

to his family if he had lived. . . . A wrongful death action does not compensate the decedent; it compensates the survivors for damages which they have sustained as a result of the decedent's death.

Under the wrongful death act the widow or family is entitled, in addition to costs, to compensation for the loss of the contributions decedent would have made for such items as shelter, food, clothing, medical care, education, entertainment, gifts and recreation.

*Hatwood v. Hosp. of the Univ. of Pa.*, 55 A.3d 1229, 1235 (Pa. Super. 2012) (quotations and citation omitted).

Appellants assert that Kimble did not present evidence at trial that he suffered any economic loss as a result of Decedent's death. Appellants argue that Kimble's claim for damages relates only to non-economic losses, which are not recoverable under the Wrongful Death Act. Kimble does not dispute that he did not provide evidence of economic loss. Nevertheless, Kimble asserts that he is entitled to damages for loss of society and comfort under the Wrongful Death Act.

As Kimble argues, this Court has upheld damages under the Wrongful Death Act for loss of society and comfort:

"Damages for wrongful death are the value of the decedent's life to the family, as well as expenses caused to the family by reason of the death." *Slaseman v. Myers*, 455 A.2d 1213, 1218 (Pa. Super. 1983). Thus, members of the decedent's family enumerated in the Wrongful Death Act, *see* 42 Pa.C.S.[A.] § 8301(b), may recover not only for medical, funeral, and estate administration expenses they incur, but also for the value of his services, **including society and comfort**. *See id.*; *see also Machado v. Kunkel*, 804 A.2d 1238, 1245 (Pa. Super. 2002) ("[T]he definition of compensable services for the purpose of the

- 23 -

[wrongful] death statute is similar to the definition of consortium as that term is applied in other negligence cases.").

*Hatwood*, 55 A.3d 1229, 1235 (emphasis added, citations modified) (quoting *Rettger*, 991 A.2d at 932-33).

Based on *Hatwood*, we agree that damages for loss of society and comfort are available under the Wrongful Death Act. Therefore, we conclude that Appellants are not entitled to a new trial or remittitur based on the jury's decision to award damages solely for loss of society and comfort. *See id.* Accordingly, we turn to Appellants' claim that the 10 million dollar damage award in this case was so excessive as to necessitate a new trial.

Based upon our scrutiny of the record, including the trial transcripts, post-trial proceedings, and the parties' briefs, we conclude that Appellants are entitled to a new trial based on the excessiveness of the damage award. It is well-settled that:

> [t]he grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court. This [C]ourt will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive.

*Tillery v. Children's Hosp. of Philadelphia*, 156 A.3d 1233, 1246 (Pa. Super. 2017) (quotations and citation omitted).

Moreover:

- 24 -

> In evaluating a claim that a verdict is against the weight of the evidence, Pennsylvania courts employ a **shocks-the-conscience litmus**. The trial judge's authority to award a new trial on weight-of-the-evidence grounds is narrowly circumscribed on account of the principle that credibility questions are exclusively for the fact finder. The matter is couched as discretionary in the trial court, with its role in the assessment being afforded primacy in view of its substantially closer vantage to the evidentiary presentation as compared to that of an appellate court. Relief is available in an appellate court only if it can be said that the trial court acted capriciously or palpably abused its discretion.

***Com., Dept. of Gen. Servs. v. U.S. Mineral Prods. Co.***, 956 A.2d 967, 973-74 (Pa. 2008).

In this case, the jury heard limited evidence from both Kimble and his son regarding the nature of the relationship between Kimble and Decedent. They spoke generally of Kimble's sadness following Decedent's death and testified that Kimble had to move in with his mother because he did not like living alone. N.T., 3/22/18, at 21, 22-24, 33, 58-59.

The trial court, in rejecting Appellants' claim relating to the excessiveness of the damages award, stated:

> The wrongful death claim award does not shock the conscience of the [c]ourt and is supported by the weight of the evidence. The evidence of record clearly is sufficient to support the jury's wrongful death verdict. How much is a marital relationship worth to a surviving spouse? We leave that determination to the wisdom of a jury. To compare verdicts of other juries/fact finders in order to determine an appropriate award herein strikes at the independence of the jury process.

Trial Court Order, 2/22/19, at 5 n.1.

While we do not disagree with the above statement, our independent review of the trial court's decision and the record leads us to conclude that

- 25 -

the trial court abused its discretion in failing to vacate the damages award. First, the trial court's decision reflects no examination of the testimony presented at trial relating to non-economic damages. The standard of review for a claim of excessive damages requires the trial court to assess the evidence presented by the parties in reaching its conclusion as to whether the damages the jury awarded were appropriate. **See U.S. Mineral Prods. Co.**, 956 A.2d at 973-74. In this respect, the trial court only provided a general assertion stating that "[t]he evidence of record clearly is sufficient to support the jury's wrongful death verdict." Trial Court Order, 2/22/19, at 5 n.1. Because Kimble did not present evidence of economic damages arising from Decedent's death, and the evidence he presented related to non-economic damages was limited, we cannot say, on this record, that the evidence supports the 10 million dollar damages award.

Second, as Appellants point out, the 10 million dollar damages award in this case was far greater than other wrongful death awards for loss of society and comfort that this Court has affirmed. **See, e.g.**, **Tong-Summerford v. Abington Mem'l Hosp.**, 190 A.3d 631, 652 (Pa. Super. 2018) (affirming a 1.5 million dollar wrongful death award for medical malpractice that caused the death of an 88-year-old parent/grandparent); **Hatwood**, 55 A.3d at 1241 (upholding a jury award for 1.5 million dollars for loss of society and comfort for medical malpractice that occurred during delivery that caused a child to die from complications of cerebral palsy 17 months after birth); **Rettger**, 991

A.2d at 932-33 (affirming a jury's award of $2.5 million for loss of society and comfort where decedent was unmarried, had no children or dependents, and provided limited services in his parents' home on weekends). Contrary to the trial court's assertion, this Court has previously looked to other decisions in determining the appropriateness of a wrongful death award. *See Tong-Summerford*, 190 A.3d at 652 (concluding that the 1.5 million dollar wrongful death award was "consistent with other Pennsylvania verdicts for wrongful death claims"). In this case, the 10 million dollars awarded to Kimble was well in excess of the awards in the above-referenced cases.

Based on the trial court's failure to examine the evidence in this case in addressing Appellants' challenge to the excessiveness of the jury's 10 million dollar award, and the award's lack of consistency with other wrongful death verdicts in Pennsylvania, particularly for damages for loss of society and comfort, we conclude that the award was excessive.

In sum, we affirm Appellants' liability to Kimble, but vacate the judgment entered against Appellants and remand to the trial court for a new trial limited to the issue of damages.

Affirmed in part and vacated in part. Judgment vacated. Case remanded. Jurisdiction relinquished.

Judge Colins joins the memorandum.

Judge Nichols notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/20